EMMETT CRANE v. LIBERTY FOUNDRY COMPANY, Appellant.—17 S. W. (2d) 945.

Division One, March 29, 1929.

*Jones, Hocker, Sullivan & Angert* and *Williard A. McCaleb* for appellant.

*Kurt Von Reppert* and *Henry B. Budde* for respondent.

SEDDON, C.—Action for the recovery of damages for personal injuries alleged to have been suffered by plaintiff on November 7, 1924, while in the employ of defendant corporation as a laborer in its iron foundry in the city of St. Louis. At the time of his alleged injuries, plaintiff was engaged in pulling an empty shank or ladle, weighing approximately 250 pounds, along an overhead rail, or track, to a cupola, or blast furnace, where the ladle was to be filled with molten metal. The overhead rail, or track, from which the ladle was suspended, and upon which it was carried, was one of a number of such tracks extending to different departments of defendant's foundry, the various tracks being connected by overhead switches, by means of which the ladles could be conveyed from one track to another. In pulling the empty ladle, plaintiff claims that the overhead carrier, or appliance, upon which the ladle was suspended from the overhead track, ran into an open switch of the overhead track, thereby causing the two front wheels of the carrier to leave the track and causing the heavy ladle to sway and to swing around, throwing plaintiff to the floor of the foundry and against certain flasks, or molds, standing alongside and near the gangway along which plaintiff was traveling, resulting in the injuries for which he seeks recovery.

The petition charged defendant with negligence in five respects, as follows: ''Plaintiff further states that his injuries were occasioned by the negligence and carelessness of the defendant, in the following respects: (1) in that defendant's foreman negligently and carelessly ordered and directed plaintiff to push said shank or ladle when empty to be refilled from one of its departments to its cupola, herein referred to, upon and along said overhead track and switch at a time when the switch leading into said track or therefrom was open, and defendant knew, or by the exercise of ordinary care could have known, that said switch was open and that said track was not reasonably safe to push said shank or ladle from said department to said cupola; (2) that the defendant negligently and carelessly failed to set said switch in line with said track before ordering and directing plaintiff to push said shank or ladle from one of its departments to said cupola when defendant knew, or by the exercise of ordinary care could have known, that it was dangerous and plaintiff was likely to be injured in moving said shank or ladle upon said overhead track from one of defendant's departments to said cupola when said switch was open and not set in line with said track; (3) that defendant negligently and carelessly failed to provide means or appliances to render said track reasonably safe to push said shank or ladle thereon in the event said ladle or shank in traveling upon said track should come to an open switch and to prevent said ladle or shank from running off said track and injuring employees pushing said shank or ladle; (4) that the defendant negligently and carelessly failed to inspect the overhead track and the switches running into the aforesaid track on which plaintiff was ordered to push said ladle or shank from one of defendant's departments to said cupola, before ordering plaintiff to push said ladle or shank from said department to said cupola; (5) that defendant negligently and carelessly so constructed, maintained and operated said track and switch in a defective condition, to-wit, so as to permit and suffer the same to come open and remain open of its own motion without being set or operated by anyone, and that the shanks or ladles operated upon said track and across said switches were likely to run into an open switch on said track or tracks, and persons operating said shanks or ladles were likely to be injured thereby, and that the defendant knew, or in the exercise of ordinary care could have known, said condition of said switch and track, but the defendant nevertheless, for a long time prior to the injuries of plaintiff herein complained of and at the time, negligently and carelessly maintained and operated said track and switch in said condition, which said negligence of the defendant caused and contributed to cause the injuries of plaintiff herein set forth.''

At the conclusion of the evidence, however, the trial court, by appropriate instructions given at the request of defendant, with-drew from the consideration of the jury the specifications of negligence numbered 3 and 4 aforesaid.

The answer denies generally the allegations of the petition, and pleads that plaintiff's injuries, if any, were caused and brought about by the carelessness and negligence of plaintiff directly con-tributing thereto, in the following respects: "That the plaintiff negligently and carelessly handled the shank or ladle with which he was engaged in working by running with and jerking same, there-by causing the same to come to a sudden stop when striking the switch on the track referred to in plaintiff's petition; and was fur-ther negligent in failing to watch and look at the switch on the track where he was operating said ladle, when, by so looking, he could have observed that the same was open or closed, as the case might be; and was further negligent in not closing said switch upon the track where he was operating said ladle, when, by so looking, he could move the ladle across said open switch, all of which negligence upon the part of the plaintiff directly contributed to whatever in-juries he sustained, if any." No reply to the answer is shown by the record to have been filed by plaintiff, but the cause was tried and submitted as though the conventional reply, denying generally the averments of the answer, had been filed.

The cause was submitted to the jury upon certain instructions giv-en by the trial court at the request of the respective parties, and nine of the jurors returned a verdict, finding the issues for plain-tiff, and assessing his damages at the sum of $9000. After timely but unsuccessful steps for a new trial, the defendant was allowed an appeal to this court from the judgment entered upon, and in ac-cordance with, the verdict.

Plaintiff testified that he had been in the employ of defendant for about two or three months prior to his injury, having been hired as a common laborer by one Clarence Squires, who was defendant's foreman and vice-principal in charge of departments 3 and 4 of defendant's foundry. At the commencement of his employment, plaintiff was put to work at a sand mixing machine, but some three or four weeks prior to November 7, 1924, the date of his injury, he had been put to work by the foreman, Squires, in the molding de-partment. Plaintiff's work in such department was to deliver the molten metal from the cupola. or blast furnace, to the employees known as molders, who worked at certain stations, known as "floors," in the molding department of the foundry. The "floors," or stations, of the molders, however, were on the same common level as the floor of the foundry. The molten metal is conveyed to the molders in large steel buckets, or ladles, which are referred to in

the record as "shanks," each weighing, when empty, approximately 250 pounds, and, when filled with molten metal, about 700 pounds. The ladle was suspended from the overhead rail, or track, by means of a long steel rod which was attached to a carrier, consisting of a steel frame mounted on four wheels in such a manner that two wheels of the carrier rested upon a flange on each side of the overhead rail. Each ladle or shank was equipped with handles, in the shape of shafts, by means of which the operative, or "shank man," either pushed or pulled the ladle along the overhead rail. The overhead rail was laid about eight or nine feet above the level of the foundry floor, and the suspended ladle, or shank, hung so that the bottom of the ladle or bucket was about a foot above the level of the floor. The switches of the overhead rail were operated by chains, located one on each side of the rail, which hung below the rail within in easy reach of an operative of the switch, who, by pulling upon the left-hand chain, could throw the switch to the left, and by pulling upon the right-hand chain could throw the switch to the right. There is some evidence that the switches were equipped with a safety guard, which was designed and intended to prevent the carrier of the shank or ladle from leaving the overhead rail in the event that the switch was not properly set, or was left open.

According to the testimony of plaintiff, about four o'clock on the afternoon of plaintiff's injuries, he was ordered and directed by the foreman of the molding department, Clarence Squires, to take a ladle of molten metal from the cupola to the "floor," or station, of a molder named George Simon. The events following the order and direction of the foreman Squires are thus related by plaintiff in his testimony: (Direct examination): "Q. Now, on this day where was Mr. Squires (foreman) just before you were hurt? A. He came and ordered me to take George Simon iron. Q. Where was he standing when he ordered that? A. He was in front of me, motioned me out from the cupola. Q. There is a switch that runs from the cupola into the main track, that is, runs toward Simon's floor? A. Yes, sir. . . . Q. Well, after you got your shank full of iron that day, how did you take it out from the cupola to the track, to Simon's floor there? A. He let me out. Q. Who? A. Squires. Q. Well, who, if anybody, set the switch? A. Squires set the switch for me to come out and go in number three room. Q. You went up then to Simon's floor. A. Yes, sir. Q. He is a molder up there? A. Yes, sir. . . . Q. What did Squires do after you got started on your way? A. He told me to give Simon iron, to hoist, to finish pouring in that and then have Simon's lined up; he walked up and told Simon to line up for Shorty to take it across the gangway, what iron I had left, and I gave him (Shorty) a hand ladle of iron, and wasted some in chill pots and started back.

Q. Now, did Squires get on up with you to where Simon's floor was? A. Yes, sir. Q. And what did you say he told Simon to do? A. To line the switch and let me through when he got through pouring off. Q. That is, to cross over north? A. Yes, sir. Q. Further on into the department, number 3? A. Yes, sir, still in number 3. Q. Still in number 3, and to give iron to Shorty? A. Yes, sir. Q. When you were pouring iron like that, and delivering it, and distributing it, going from the cupola to the molders in the department, who set the switches for you? A. Squires. Q. And when you went back, who set them for you, I mean, from the department to get iron? A. Squires. Q. Had you received any instructions from him, or orders, or anything, with reference to who would set the switches for you while you were working there? A. He set it, as he said. Q. Well, did he tell you anything about who was going to set the switches for you all the time when you were pouring iron? A. Well, no, not practically; he just came out and told me who was to set them; I never did ask him the question. . . . Q. You were south of this switch when you delivered iron to Simon? A. Yes, sir. Q. Now, in order to go up to this molder (Shorty) you had to cross the switch and go north? A. Yes, sir. Q. And you say Simon set that switch for you? A. Yes, sir. Q. And the foreman was where, when he (Simon) set it for you? A. I judge he was twenty-five or thirty feet below the switch there, talking to Mr. Mellow (president of defendant corporation). Q. At the time Simon set the switch, where was Squires then? A. He was right across the gangway from us. Q. Squires standing right near you there? A. Yes, sir. Q. You mean the gangway, this little open areaway that goes in between the so-called floors, that is the gangway? A. Yes, sir. Q. He (Squires) was right across from you, and after you went along that switch, what did you deliver to Shorty? A. One hand ladle of iron. . . . Q. What did you do then? A. I wasted the rest in chill pots. Q. What are chill pots? A. That is where we pour the iron out, where it is too cold to run a mold. . . . Q. What did you do then? A. The cupola bell rang. Q. What does that mean? A. That means the cupola is running over and no ladles there to catch the iron, and I turned my ladle back. Squires was motioning for me to come. Well, I run and I went through this switch; I made a run and went through the switch. Q. Where was Squires standing when he motioned to you to come on, with reference to where you were located? A. He was south of me, on the right-hand side of the gangway. Q. And about how many feet from the switch would you judge he was? A. About twenty-five or thirty feet, I judge. Q. Then how many times did he motion you to come on? A. Twice. Q. And he was standing there with Mr. Mellow, the president of

the company, was he? A. Yes. Q. And you say a bell rang there, in the cupola? A. Yes, sir. . . . Q. Well, now, in what gait were you coming along there after Squires had motioned you to come on? A. Well, a good trot and practically a run. Q. Now, Mr. Crane, how many times did Squires motion to you to come on? A. Twice. Q. And was he facing you at the time? A. Yes, sir. Q. Looking in your direction? A. Yes, sir. Q. And you turned around? A. Yes, sir. Q. With your shank, and was pulling the shank in back of you? A. Yes, sir. Q. And you had heard the bell ring at the cupola? A. Yes, sir. Q. Why did you keep on going when the foreman motioned you to come? A. Well, that was a signal to hurry back when the bell rang. . . . THE COURT: How did you know what the bell meant? A. Why, Squires told me what it was for. Q. Did Squires ever tell you anything, what it was for, when he signaled for you to come on? A. Yes, sir. Q. What did he tell you he expected you to do? A. To get down there and get the iron before it ran over. Q. Now, when you got to this switch and it was open, what happened to the shank? A. A sudden stop come, jerked me backward, jerked it out of my hands, and threw me against a pile of flasks that was on George Simon's floor at the corner of it, the right side. Q. And the carrier got off the track, did it? A. Yes, sir. The rollers, two wheels. Q. And what did it do to the shank? A. Well, it jerked it out of my hands and swung it around in the air. Q. Where did it throw you? A. To the right, against this, like that pile of flasks on the right-hand corner. . . . Q. Had the foreman ever told you anything as to what to do when you came along on his signal, with reference to the switches? A. Yes, sir; not exactly. Q. Had he told you anything about it? A. Well, not exactly. Q. What do you mean; did he say anything with reference to whether you should come on or stay back, or what? A. Yes, sir; to come on when he ordered me to come on; that was the instruction." Cross-examination: "Q. Now, it being true that there were as many as half a dozen switches, and as many as half a dozen of those ladles, I want to ask you if it is not also true that you were instructed by Mr. Squires, your foreman, when you went to work at this work, that it would be the duty of each man, of those men operating those pull-ladles, to watch those switches, and open and close them, as the case might require? A. No, sir; I was not. Q. You were not told that at all? A. No, sir; not by him. Q. Now, isn't it true that Mr. Squires, your foreman, frequently would just do that as an accommodation to a man, when he would see the workman coming with the ladle full of molten lead or metal, or whatever you were hauling, he would just open or close it (the switch) as a matter of accommodation? A. No, sir. Q. And didn't you understand it was

that way? A. No, sir. Q. And didn't you understand that it was the duty of the workmen there to operate those switches? A. No, sir; I did not. Q. Now, these switches, they were operated by a chain hanging down, with a handle to it, were they not? A. Yes, sir. Q. And all you had to do to open or close one of those switches, when you got to it, was to pull this lever or handle to the chain? A. Yes, sir. Q. And that would either open it, or close the switch, as you wanted to do it? A. Yes, sir. . . . Q. You did not do that when you were there? A. No, sir. Q. You left the switch open? A. No, sir. Q. You left it closed? A. It was closed when I went through it. Q. And it was open when you came back? A. Yes, sir. Q. Had you ever, at any time, opened or closed either one of those switches? A. Once or twice, I guess. Q. How did it happen that you came to open it or close it once or twice? A. Well, sir, I had to get out of the way of the other ladles. Q. Why didn't the foreman do it? A. He was not there at the time. Q. Then it is true that the workmen themselves opened and closed those switches, isn't it? A. Some of them, practically; I did not all the time. Q. You say they do that, practically? That is, practically all the time? A. No, sir. Q. You saw them do it, didn't you? A. I seen some of them doing it; yes, sir. Q. You did yourself upon occasions? A. Once or twice I did. Q. But upon this occasion you did not? A. No, sir. Q. And upon this occasion you did not look at the switch to see whether it was open or closed, did you? A. No, sir. Q. And if you had looked you could have seen that it was open, couldn't you? A. By getting down and bending over, I could have, from where I was at. Q. And you knew if you ran into an open switch with one of those heavy buckets, it would cause a jarring of the bucket? A. Yes, sir. Q. Probably a displacement of the wheel, didn't you? A. Yes, sir. Q. Did you walk back with your bucket and push it, or did you run? A. Well, I was not, what you call between a run and a trot; I was going pretty rapid when I hit the switch. . . . Q. A good swift trot? A. Yes, sir. Q. And had you trotted before? A. Yes, sir. Q. Had the foreman ever told you to run with one of those buckets? A. Yes, sir; he told me to hurry up a time or two before that. . . . Q. You can't tell any time and place he ever told you to run with one of those buckets, can you? A. Yes, sir. Q. Just tell me when he told you to run with a bucket. A. Well, sir, he told me a day or two before that; we was kind of late. Q. To hurry up? A. To hurry up; yes, sir. Q. And you took that to run? A. That is the way I figured it. Q. He never said run, did he? A. No, sir. Q. Or he never told you to trot at any time, did he? A. He said move up, hurry up. Q. Didn't he at all times tell you to watch those switches and be

cautious about those switches? A. No, sir; not me. Q. Never told you? A. No, sir. . . . Q. Who told you and showed you how to operate those switches? A. There wasn't nobody. Q. You mean you operated one without knowing how to operate it? A. No, sir. Q. Well, did you know how to operate it when you went to work on it? A. No, sir; I did not. Q. Well, you stated a moment ago that you operated them several times? A. Yes, sir; it was after. Q. Well, they were just simply—you could pull that chain up and see that the switch had been open and closed? A. Sure; yes, sir. Q. Whichever side you wanted to pull it on? A. Yes, sir. Q. It was so simple that you could see that? A. Yes, sir. Q. You did not need any instruction? A. No, sir. Q. Didn't you ask anyone who was to operate those switches? A. No, sir; not practically; I was not advised by nobody, but only Squires, he came and got me and placed me on there. . . . Q. You never asked anything about who was to operate these switches, and he never told you who was to operate them? A. No, sir. Q. Now, you talked to Mr. Squires, rather he talked to you, about the ringing of that bell, back up at the cupola; what did he tell you that the ringing of the bell up at the cupola meant? A. It meant the iron was running over out of the cupola, waste of iron. Q. And for somebody to come with the ladle? A. Yes, sir. Q. And that is all he told you? A. Yes, sir; practically, that is all. Q. When he said he would signal to you, if he did say that, I understood you to say a moment ago he did, with his hand, that he was motioning twice, that that also meant you were to go back up to the cupola? A. Yes, sir. Q. And that is all he said about that? A. About what, now? Q. About signaling twice with his hand? A. He motioned for me to come on twice. Q. No, I am asking you what he said to you as to what he meant when he would motion, if he said anything? A. Well, he said that meant for me to come on, for us to come on. Q. When was it that he told you that? A. Well, sir, along the same time when he had taken me to the shank. Q. How did he come to tell you, to mention that was meant for you to come on? A. Well, sir, when he put me on this shank he told me to come with him and to do as he said, and to follow him. Q. Now, you knew, without Mr. Squires telling you, when he mentioned this, indicating with my own hand, that he motioned for you to come there, didn't you, without him telling you? A. He meant for me to come on. Q. You just construed that is what he meant when he motioned? A. Yes, sir. Q. He never did tell you what this motion meant, did he? A. Yes, sir. Q. When did he tell you that? A. He told me when he put me on this shank I was to go by his rule; that he was my boss. Q. You was to go by his rules? A. Yes, sir. Q. But did he say, 'When I motion twice that means

for you to come on'? A. He told me where; he would tell me where to take iron, and he done it that way. Q. Now just tell me when he did, if he ever did, tell you, 'When I motion twice with my hand that means to come on?' A. Motion twice, he never did have twice in it; he said the motion meant for us to come on to the cupola, or wherever he wants us to go. Q. Did he ever tell you, at any time, when he motioned to you that meant for you to come on? A. Yes, sir. Q. When was that? A. When he put me on this shank. Q. When he put you on the job? A. Yes, sir. Q. He said, 'When I motion to you that means for you to come on'? A. Yes, sir. . . . Q. You never saw anybody else touching those switches, excepting some of your fellow-workmen, or Mr. Squires, your foreman? A. He told the molders to. Q. Did you see the molders? A. George Simon, yes, sir; all those fellows. . . . Q. Now, I will ask you how high above your head is that track? A. Well, my head, I judge, is two feet. Q. Two feet above your head? A. Maybe a little better than two feet. Q. And it is in plain view; all you have to do is to look up to see it? A. Well, not exactly, where I was at it was not in plain view to me. Q. I will ask you if it is not so, in approaching one of those switches with your pull-ladle, with its handles, if all you have got to do is to just glance up to see whether or not this safety guard is set in the direction in which you are going? A. No, sir, that ain't all you got to do. Q. And if you can see that, and if it is not open and visible to the naked eye, by just glancing up? A. No, sir, Q. And weren't you instructed, when you went to work, to always watch to see whether or not this switch was open or closed in the direction in which you were going? A. I was not. Q. While at this particular switch, where you allege the accident happened, you did not make any effort to stop the car before you got there? A. It was done too quick, I did not see it. Q. And just before you got to this switch, you did not look up to see whether this switch was set in the direction in which you were going? A. No, sir, I was hot and sweating, and I heard the bell ring, and the two signals that he gave me, and I rushed back. Q. The fact that you were hot and sweating, and running, you did not look up to see whether this switch was set in the direction you were going? A. I figured the signal, everything was all right. Q. I am not asking what you figured. Did you look up? A. I looked back down the gangway. Q. Did you look up at the switch? A. I never looked at the switch, because I had not been over it very long. . . . Q. On this occasion, when your foreman motioned you to come on, was that the only time he ever motioned for you to come on? A. No, sir. Q. How often had he motioned before? A. I never did try to keep account of it; several times before. Q. What was your way

of doing with reference to going ahead or stopping to set the switch? A. I figured everything was safe, and I went on. Q. Did you ever stop to set a switch when he motioned to you to come on? A. No, sir.''

Plaintiff read in evidence, as admissions against interest, portions of the deposition of Thomas Mellow, president of the defendant corporation, as follows: ''Q. Did you see the accident? A. I did; yes, sir. Q. You were standing, I believe, close to Mr. Squires there at the time this happened? A. Yes, sir. . . . Q. Did you notice that day, just before Mr. Crane ran into this open switch, that the gong on the cupola was ringing? A. Yes, sir. Q. That was the signal for the men to come back and get molten metal, or otherwise the metal would overflow? A. No; they would have—they have a stop to it. Q. In other words, the cupola bell rings for the men— A. They are waiting for the men to come down. Q. To go and get the molten metal out of the cupola? A. Yes, sir. Q. And, of course, the men, as they emptied their ladles— you call them either shanks or ladles—they are supposed to hurry up and get there and get that metal, aren't they? A. Yes, sir. Q. At the time this happened you were standing, I believe, in a position with your back a little turned or sideways, back turned towards the switch? A. I may have been coming down here (indicating), and I heard a noise. Q. That is what attracted your attention? A. Yes, sir. I saw him (plaintiff) coming down there a few feet above there, and he was hurrying down to get to the cupola. Q. You had not observed before that this switch was open? A. No, sir. Q. You think it would be approximately—that is, you were approximately—about thirty feet away from that switch, the width of two floors, they call it? A. Possibly. I would say, probably. Q. And you were somewhat turned sideways towards that switch from the direction in which he was coming? A. Yes. Q. And you, of course, heard or saw him coming? A. Yes, I saw him coming down there—just as he came around I naturally turned my face that way. Q. And the next thing you heard was a noise and a sudden stop? A. Saw it, too. I was looking on, because he was coming down with a rush. Q. And you had not observed that this switch had not been lined, or had not been opened, while he was on the way coming down? A. No. Q. You had been looking in that direction? A. I was not looking towards the switch. I was looking in a general way. Q. You were not paying any particular attention to the switch at that time? A. No. Q. The bell had sounded in the cupola for the men to hurry back and get the molten metal? A. Yes. Of course, in that way the metal is being stopped up, and it would make some inconvenience for the men out there—it would not put the cupola out, but would

make it inconvenient for the men and would create a little divergence. Q. It would stop up the rapid transit and delivery? A. Yes. Q. Can you tell me whether or not you noticed at that time whether he (foreman Squires) signaled for the men to come on with empties, whether you remember his hand motioning a couple of times to come on? A. I could not say. I could not say that I did see him, but I would naturally assume that the probabilities were that he might have done it. Q. You could not say that he did not do it, because it would be natural for him to do that? A. Yes. Q. Because whenever the cupola bell rang, of course, it was his duty, as foreman supervising these men, to see that they got there, and give them the signal to come on; is that correct? A. That is right, as far as I know. . . . Q. On this occasion, of course, which was getting molten metal out of the cupola, they were going on a sort of a dog trot? A. Yes. Q. Take that empty shank—of course, if I understand these operations—I want to get that clear—when these men come back the foreman is there to see that the work is expedited? A. Yes, sir. Q. But you have seen the foreman set the switches? A. Yes, sir. I have seen them do that. Q. How many times have you seen them, in six months before this accident? A. I could not say. . . . Q. Was there anything broken about that switch? A. No, no. Q. Has it ever happened that those switches got out of alignment or got jammed? A. Yes, sir. Q. In other words, a jar sometimes affects them? A. Yes, sir. Q. How often has it happened, that you know of, that these things—the rails or the switch rails—that the switch rail was moved and got out of alignment of its own accord? Could you tell me? A. No, sir. Q. Accidents have happened on that account, can you tell us? A. Not to a serious extent. Q. But cars have gotten jammed on the switches? A. Once in a while.'' Defendant read in evidence the following question and answer from the same deposition: ''Q. And when these men come back they have the different departments and switches, then, of course, either he or the sub-foreman—they called them assistant foremen—they would set the switch for the men as they came in a hurry, and hurry them up in order to make it convenient quickly for them to go to the cupola for the metal? Isn't that right? A. Well, no. The man with the ladle is the proper man to see that the switches are clear, as I see it. There is no foreman that is supposed to do that. The men are supposed to look for that themselves.'' .

The foreman, Clarence Squires, testified on behalf of defendant: ''Q. Now, who employed and superintended the work of these men engaged in transporting these buckets and placed them from the cupola to the— A. The foreman gives the orders. Q. That is your duty? A. Yes, sir. Q. Who employed the men? A. Well, the

foreman usually employs them. Q. Take the plaintiff in this case, who employed him? A. I did. . . . . . . . Q. What instructions, if any, have you given with reference to whose duty it was to operate those switches? A. I told him that it was his place to always watch all switches, with iron, and if any were open to watch them very carefully that he did not run through an open switch; keep them lined up. Q. Was that the duty of this man operating these bowls to also operate the switches? A. Yes, sir. . . . Q. Approaching one of those switches with a can, is it possible to see whether it is open or closed? A. Yes, sir. Q. Is there any difficulty in making that ascertainment? A. None whatsoever. . . . Q. Does it occur that sometimes, the foreman, when the men pushing these ladles would come in with hot molten metal, opens the switch for them, or closes it, as the case might require? A. We never give them any instructions to do that; sometimes a molder might, in taking the hoist, or what we call a hoist, right out of the bowl, sometimes the molder might take the shank and put it in on the switch. Q. But, if they do that, it is just an accommodation for the ladle man? A. Yes, sir. Q. They are instructed, the ladle men, to handle their own shanks? A. To handle their own shanks; yes, sir. . . . Q. You mentioned your instructions to the plaintiff in regard to his duty to open and close those switches; did you give the same instructions to the other workmen using this bucket or ladle? A. You mean the other shank pushers? Yes, sir. . . . Q. The character of the work is such that it has got to be expedited there? A. Yes, sir. Q. To keep this metal from cooling? A. If they don't hurry to get back they would have to tap up the cupola, which would cause a shutdown. Q. Well, with reference to the bell which is mentioned, ringing of the cupola, what instructions or information did you give to the plaintiff in regard to what that bell was for? A. That bell meant for them to hurry up and get back; we call it a bell, but they just have a hammer that they hammer on a piece of iron, or something there; that is for the bell, and that means for them to hurry up and get in, that the shanks were nearly all gone from the cupola.'' Cross-examination: ''Q. Do you recall you went right with him and went up to Simon's floor? A. No. Q. You won't say it did not happen, will you? A. No; I won't say it did not. Q. Do you recall at that time whether or not you set the switch coming from the cupola in the north-south—rail to go up to Simon's do you? A. No, I—Q. You won't say you did not set the switch for him, will you? A. No; I do not. Q. Do you recall, after you got to Simon's floor and Simon took a hoist, that you told Simon to line him up to go to Shorty, a Spaniard, working at the north end of department 3; do you recall that? A. No, sir. Q. You won't say it did not

happen? A. No, sir. Q. Do you recall whether or not, on that occasion, you did not tell Simon, 'Well, line Crane up for Shorty, to give Shorty a ladle'? A. No, sir; I did not tell Simon to line him up. . . . Q. Well, did you line him up to go up there? A. No, sir; I don't recall lining him up. Q. You don't remember; you don't know whether you did or not? A. No; I did not line him up to go up there. Not at Simon's floor. Q. You lined him up for department 3, didn't you, from the cupola? A. I would not say I did; no, sir. Q. Well, I mean at this particular last delivery, when Mr. Crane went north in department 3 and delivered to Simon first a hoist of iron; don't you remember that, Mr. Squires? A. No, sir; I do not. Q. You won't say that you did not do that, will you? A. I won't say I did not; I was all over the shop. . . . Q. Now, do you recall on that day, when you were standing there with Mr. Mellow, to the south of this switch, about thirty feet from there, that you motioned Crane to come on, the cupola bell was ringing? A. No, sir; I do not recall that; I remember the bell ringing; I don't recall—Q. You won't say you did not motion for him to come on? A. No, I wouldn't say I did not. Q. Whenever you motioned for him to come on, it was for him to come, you motioned for the laborer to. come on? A. Yes, the laborer. Q. Yes, sir; I mean the laborer, the shank man? A. Yes, sir. Q. Did you watch that switch on that occasion when you were standing there? A. No, sir. Q. Did not; did not know whether it was open or closed, did you? A. No, sir. Q. And whenever you motioned the shank man, Crane especially, to come on, he is supposed to come on, wasn't he? A. Yes, sir. Q. Come on in a hurry, too; wasn't he to hurry up? A. Well, come on, get down to the cupola. Q. Yes, of course; the metal chills quickly, doesn't it? A. Yes, sir. Q. And when it is chilled it can't be poured? A. No, sir. . . . Q. Now, from where you were standing that day, south of that switch, thirty feet, if you had looked at the switch you could have seen that switch was open, couldn't you? A. Yes, sir. Q. You did not look, did you? A. No, sir. Q. You were not paying any attention to that switch, were you? A. I was talking to Mr. Mellow. Q. But yet you gave a signal for the man to come on, didn't you? A. Yes, sir. Q. You knew he was coming when you gave him that signal, didn't you? A. Yes, sir. Q. Now, then, whenever you are there watching the delivering of this fresh molten metal, then you set the switches for the men to facilitate the work, don't you, Mr. Squires? A. Not all the time. . . . Q. Now, if you give a signal, that signal is an order that they must obey, don't they, the shank men? A. Yes, sir. Q. Did he come fast? A. I could not say, sir, if he was coming fast at that time or not. Q. Was he coming in a sort of a dog trot? A. I

could not tell you, sir, just how fast he was coming at that time. Q. Can you explain how that switch got open? A. No, sir. Q. You did not see anybody else go over that switch between the time that Crane went over from Simon's floor, over to the other floor north of there? A. I did not see them just go over it. Q. I asked whether you saw anybody go over it? A. No, sir; no, sir. Q. Was it very often that those shanks and the little trolleys got off of these switches? A. No, sir. Q. It did happen, didn't it? A. It has happened; yes, sir. Q. They jar loose, and a switch sets itself quite frequently? A. No, sir; I have never seen that happen."

There was evidence on behalf of defendant that the foreman, Squires, had given instructions to all of the shank men (of whom there were nine in all, including the plaintiff Crane) to watch the overhead switches. There was also evidence on defendant's behalf that the plaintiff was not thrown to the floor of the foundry, or against any of the flasks or molds, when the shank carrier struck the open switch, but that he immediately released his hold of the shank and ran forward so as to be clear from the swaying shank, and that he came back and assisted in replacing the wheels of the carrier on the overhead track, and then returned with the shank to the cupola for another ladle of molten metal, which he delivered to one of the molders in the department, and that plaintiff complained to no one in the foundry, on the afternoon of his alleged injury, that he had received an injury.

It is unnecessary to state herein the substance of the evidence respecting the nature and extent of plaintiff's alleged injuries, inasmuch as the defendant-appellant makes no claim herein that the amount of damages awarded to plaintiff by the verdict of the jury is excessive. Suffice it to say that the defendant adduced some medical testimony that plaintiff's physicial condition is the result of disease, rather than the result of any injury suffered by him at any time, and that there was also some evidence that he had received an injury to his back at an earlier date and while in the service of another and different employer. Plaintiff proffered medical testimony that his physical condition and claimed injuries could have resulted from being violently thrown against the flasks and molds and upon the floor of defendant's foundry by the sudden stopping of the ladle and its consequent sway.

The defendant-appellant assigns error in the refusal by the trial court of defendant's requested peremptory instruction, in the nature of a demurrer to the evidence, offered at the close of all the evidence, and in the giving of plaintiff's main instruction, numbered three.

I. Appellant urges that the peremptory instruction, in the nature of a demurrer to the evidence, requested by defendant at the close of all the evidence, should have been given for the reason that the evidence is wholly insufficient to establish the fact, or to warrant  a finding, that the switch was open at the time the foreman, Squires, gave plaintiff the alleged negligent order; or, if the switch was open at the time of the foreman's order, that the evidence is insufficient to establish that defendant had actual knowledge thereof, or to establish that the switch had been open for a sufficient length of time to import constructive knowledge thereof to defendant.

Appellant urges that the evidence is uncontroverted that the molder, Simon, lined or set the switch for plaintiff, in order that plaintiff might proceed north from Simon's floor to the floor, or station, of the molder called ''Shorty,'' and that plaintiff passed with the shank safely over the switch in proceeding to ''Shorty's'' floor, which, appellant claims, is proof that the switch was then closed and in proper alignment, but that the evidence is utterly and wholly silent as to when, how, or in what manner, the switch was opened and thrown out of alignment with the overhead rail or track on which plaintiff was operating the shank at the time the alleged injury occurred. Appellant insists that there is some evidence in the record that, at times, and from unknown causes, the switches got out of alignment and that minor accidents infrequently had happened as a result thereof, and that, at times, a slight jar would affect the switches and cause them to get out of alignment; and, furthermore, that there was evidence that some nine shank, or ladle, men were using the overhead tracks and switches in defendant's foundry for the purpose of conveying molten metal from the cupola to the various molders at their different floors or stations, and that such workmen themselves, at times, had been seen by plaintiff to set, or line, the switches. Hence, it is claimed by appellant that the evidence does not tend to indicate whether the switch was open and out of alignment, at the time of plaintiff's alleged injury, because of some deficiency in the switch, or because of a jar, or because some fellow-servant of plaintiff threw the switch open, after plaintiff had passed safely over it with his shank in going from Simon's floor to ''Shorty's'' floor, in order that the fellow-servant might convey a similar shank of molten metal along another track to another molder in the department. There is some evidence in the record that some two minutes, or more, elapsed from the time when plaintiff passed safely over the switch, in proceeding from Simon's floor to ''Shorty's'' floor, and the time when he returned with the empty shank from ''Shorty's'' floor on the return trip to the cupola, and therefore appellant claims that there is no evidence that the foreman,

Squires, actually knew that the switch was open at the time he motioned or signaled to plaintiff to return with the empty shank to the cupola, and, even though it can be said that there is any substantial evidence that the switch was open at the time the foreman, Squires, motioned to plaintiff to return to the cupola, yet the time was so short as to be wholly insufficient, as a matter of law, to import constructive knowledge of such fact to the foreman and vice-principal of the defendant.

Respondent, on the other hand, urges that the evidence is substantial and uncontroverted that, between the time that plaintiff was given and received the signal or motion from the foreman to return to the cupola and the time that plaintiff arrived at the switch with the empty shank, no one had passed, or could possibly have passed, over the switch, or disturbed the switch, and that the evidence is also uncontroverted, and, in fact, is indisputable, that the switch was open and out of alignment at the time the carrier of the shank was abruptly stopped at the switch; hence, respondent insists that he was clearly entitled to a submission of his case upon the reasonable and logical inference, drawn from the above proven and established facts, that the switch was open and out of alignment at the time the foreman Squires signaled and directed him, by twice motioning, to come on to the cupola with the empty shank. The gravamen of the negligence pleaded by plaintiff, and submitted by his main instruction, was the negligent order and direction of the foreman, given by motion of the foreman's arm or hand, to return with the empty shank to the cupola, in order that the shank might be refilled with molten metal, at a time when the switch leading into, or from, the track on which plaintiff's shank was then traveling was open and out of alignment, and when defendant, through its foreman and vice-principal, Squires, knew, or by the exercise of ordinary care could have known, that the switch was open and out of alignment. Hence, respondent insists that it matters not (so far as concerns the act or theory of negligence submitted) when, how, or in what manner, or from what cause, the switch became open and out of alignment with the track along which plaintiff was returning to the cupola with the empty shank, so long as there is substantial and uncontroverted evidence that no one had passed over, or disturbed, the switch between the time that the foreman ordered and directed plaintiff, by motion of the arm or hand, to return to the cupola and the time when the carrier of the shank ran into the open switch and was abruptly stopped thereby.

The evidence herein tends to show that the foreman, Squires, had superintendence and supervision over the plaintiff while he was performing the duties of a shank man; that it was the duty of the foreman to expedite the work of the shank men, including the plaintiff;

that signals were given from the cupola by the sounding of a bell or gong, which signals meant (according to the testimony of Mr. Mellow, the president of defendant corporation, and of the foreman Squires) that the shank men were to hurry back to the cupola with the empty shanks, and that it was the duty of the foreman, Squires, "whenever the cupola bell rang, to see that they (the shank men) got there (to the cupola), and to give them the signal to come on;" that the cupola bell rang while plaintiff was at the floor, or station, of the molder called "Shorty," and that plaintiff immediately turned and saw the foreman Squires motion to him twice to return to the cupola with the empty shank; that such a motion from the foreman meant, and was intended as an order and direction (according to the testimony of the foreman, Squires) to "come on, get down to the cupola" with the empty shank; that the foreman Squires (according to Squires's own testimony) was in position to see, and could have seen, that the switch was open had he looked, but that Squires did not look to see whether the switch was open or closed, and was paying no attention to the switch, yet he twice gave a signal or motion to plaintiff to come on with the empty shank, knowing that the signal, or motion, so given by him was an order and direction that plaintiff, as a shank man, must obey, and knowing that plaintiff would come on in obedience to the signal, or motion, whenever the foreman gave the signal; that the shank man "was supposed to come on" whenever the foreman Squires motioned the shank man; that, from the time the signal or motion of the foreman Squires was given to plaintiff until the shank carrier ran into the open switch and was abruptly stopped thereby, no one had used, or could have used, or disturbed, the switch; and that the derailment of two rollers or wheels of the shank carrier was caused by an open switch of the overhead track system. Allowing to plaintiff every reasonable intendment and inference from such evidence, as we must do in passing upon a demurrer to the evidence, we think that plaintiff was clearly entitled to a submission of his case to the jury, and to a finding by the jury whether the facts and circumstances so shown in evidence constituted negligence on the part of defendant.

The general rule is thus stated in 39 Corpus Juris, 483: "Since it is the duty of a servant to obey an order given by one in authority over him, if not manifestly unreasonable, the master must use reasonable care to protect his servants from danger in the execution of orders, and will be held liable for his own or his vice-principal's negligence in this regard."

A somewhat similiar contention was made by defendant in Schlueter v. Connecting Railway Co., 316 Mo. 1266, 296 S. W. 105, wherein defendant's trainmaster and vice-principal directed a switching crew, of which plaintiff was a member, to proceed with a switching

engine along a storage or receiving track in the railroad yards of another carrier, and the plaintiff, who was riding on the foot-board of the tender of the switching engine, pursuant to the order and direction of defendant's vice-principal, was injured in the derailment of the engine tender due to a defective track over which the switching engine was backing. We therein held that there was substantial evidence that the track was defective at the time the defendant's vice-principal gave the order and direction, and the evidence of the derailment of the tender was indisputable, wherefore it was a question of fact, determinable by the jury, whether defendant and its vice-principal knew, or could have known, by the exercise of ordinary care, of the defective condition of the track at the time the alleged negligent order of the trainmaster was given. Likewise, in Hoffman v. Lime Co., 317 Mo. 86, 296 S. W. 764, wherein plaintiff, an employee of defendant, was injured by the falling of several rocks from the face of a quarry bluff, at the foot or bottom of which he had been directed to work by defendant's foreman and vice-principal, this division of this court ruled that the jury, as the exclusive triers of the facts, might reasonably and properly draw the inference from the facts in evidence that, had defendant, or its foreman, inspected the quarry bluff before putting plaintiff to work at the foot of the bluff, the defendant would, or could, have discovered the loosened and dangerous condition of the rocks which fell and injured plaintiff, in time, by the exercise of ordinary care, to have removed said rocks and thereby have prevented injury to plaintiff. Other cases in which there were like holdings might be cited, but we need only refer to a few of them to illustrate the general application of the principle that, where a vice-principal of the master gives an order or direction which the servant is bound to obey, and the danger in obeying the direction or order of the vice-principal is not so glaring that a reasonably prudent servant in the exercise of ordinary care would refuse to obey the direction, the questions whether the vice-principal was negligent in giving the order or direction to the servant, and whether the vice-principal knew, or in the exercise of ordinary care could have known, that injury might result to the servant from obedience to the order and direction given by the vice-principal, are issues of fact which are properly referable to, and determinable by, a jury. [Ingram v. Coal Co. (Mo. Sup.), 5 S. W. (2d) 413; McCauley v. Brewing Assn., 300 Mo. 638, 254 S. W. 868; McCarver v. Lead Co. (Mo. App.), 268 S. W. 687.]

We cannot say, as a matter of law, that the danger from obedience to the order and direction of the foreman and vice-principal, Squires, was so glaring, open and obvious to the plaintiff that, in the exercise of ordinary care on his part, plaintiff should have refused to obey

the order and direction. It might be said, in this connection, that appellant makes no contention herein that plaintiff was guilty of contributory negligence, as a matter of law, in obeying the order and direction of the foreman, Squires, and in failing himself to observe that the switch was open and out of alignment, and therefore that the demurrer to the evidence should have been sustained on that ground. On the contrary, it is apparently conceded by appellant that the question of plaintiff's contributory negligence was one of fact which was properly submissible to the jury; and such question was submitted to the jury, and properly so, we think, by plaintiff's main instruction numbered three, to be presently quoted and considered herein. We think that the jury, as the exclusive triers of the facts, had the right to draw, from the facts and circumstances established in evidence, the reasonable and logical inference that the switch was open and out of alignment at the time the foreman Squires gave the order and direction, by motion of his arm or hand, to plaintiff to come on along the track leading to the cupola with the empty shank or ladle, and that such signal or motion amounted to an implied assurance by the foreman Squires that it was safe for plaintiff so to do and that the switch was properly and safely set at the time the foreman gave the order.

But it is urged by appellant that the master, or his vice-principal, may give reasonable orders to the servant in order to facilitate the work to be performed by the servant, and that "an order to hurry is not in itself any evidence of negligence,"—citing English v. Shoe Co., 145 Mo. App. 439; Pulley v. Standard Oil Co., 136 Mo. App. 172; and Ryan v. Lea (Mo. App.), 249 S. W. 685. Without questioning on our part the correctness of the rulings just cited, it may be said, however, that the gist of plaintiff's case and theory of recovery herein is not grounded on a negligent order of the foreman "to hurry," but upon the negligence of the foreman or vice-principal of defendant in ordering and directing plaintiff to proceed along the track with the empty shank or ladle at a time when the switch leading into or from such track was open, and when defendant knew, or by the exercise of ordinary care could have known, that the switch was open and that said track was not reasonably safe to push, or pull, the empty shank from "Shorty's" floor or station to the cupola.

Appellant furthermore insists that it was error for the trial court to refuse defendant's requested peremptory instruction, for the reason that, if there be any substantial evidence of negligence herein, such negligence was that of a fellow-servant of plaintiff, for whose negligence the defendant is not actionably liable. Again appellant loses sight of the fact that the plaintiff seeks a recovery herein, and submitted his case, solely and singly upon the ground or charge that a negligent order and direction was given to plaintiff by defendant's

foreman and vice-principal. Obviously, the order and direction of the foreman, Squires, was that of a vice-principal of the defendant, for whose order and direction, if negligently given (and the jury so found), the defendant is actionably liable, and was not an act of negligence on the part of a fellow-servant of plaintiff. A master is bound to use ordinary care in directing the management of his business through the orders and directions of foremen or other vice-principals, and such foremen are not in any sense fellow-servants of employees who are acting under, and pursuant to, the orders and directing authority of the foremen. [Foster v. Ry. Co., 115 Mo. 165; Russ v. Ry. Co., 112 Mo. 45; Stephens v. Ry. Co., 96 Mo. 207; Dowling v. Allen & Co., 74 Mo. 14; McCauley v. Brewing Assn., 300 Mo. 638.]

Lastly, it is urged by appellant that, viewing all the evidence in the case, the verdict of the jury thereon must necessarily have been predicated upon a mere guess, speculation and surmise, and therefore the requested demurrer to the evidence should have been sustained. This contention is bottomed upon the claim and insistence of appellant that the foreman, Squires, had neither actual nor constructive notice or knowledge that the switch was open and out of alignment at the time the order and direction was given by Squires to plaintiff to return to the cupola with his shank or ladle, and (to use the language of appellant's brief) "that the evidence does not show that anything had occurred to put the foreman on guard, or to lead him to anticipate, in the exercise of ordinary care, that something had occurred at the switch which would make it dangerous for respondent plaintiff to pass over it." But, as we have said, there is substantial evidence that no one had passed over, or disturbed, the switch from the time that Squires gave plaintiff the order and direction, by motion or signal, to return the shank to the cupola and the time that plaintiff reached the switch with the empty shank, and the evidence is indisputable that the shank carrier was stopped and derailed by an open switch, which was out of alignment with the rail or track on which plaintiff's shank was traveling. There is also testimony, given by the foreman, Squires, himself, that he was in position to see, and could have seen had he looked, whether the switch was open at the time he gave the signal or motion to plaintiff to return to the cupola with the shank, but that he did not look to see whether the switch was open or closed, and paid no attention to the switch, prior to or at the time he gave such signal to plaintiff, although he knew that plaintiff would come on with the ladle in obedience to the signal, which order and direction of the foreman plaintiff was bound to obey. Such evidence, we think, was amply sufficient to warrant the jury in drawing the reasonable and logical inference that the switch was open and out of alignment at the time the fore-

man Squires gave plaintiff the order and direction, by motion or signal, to return to the cupola with the ladle, and hence the verdict of the jury thereon cannot well be said to be founded on mere guess and conjecture. But can it be well and properly said (as appellant contends) that the foreman, Squires, did *not* have *actual notice* or knowledge that the switch was open at the time he gave the signal to plaintiff? Under all the evidence herein, and upon the foreman's own testimony, we are of the opinion that the foreman was chargeable with *actual notice* of the open switch at the time he gave the order and direction to plaintiff. This court, in discussing what is meant by *actual notice*, has said, in Rhodes v. Outcalt, 48 Mo. 367, 370: "A notice is regarded in law as *actual* when the party sought to be affected by it knows of the existence of the particular fact in question, or *is conscious of having the means of knowing it,* although he may not employ the means in his possession for the purpose of gaining further information." (Italics ours.) In 46 Corpus Juris, 539, 540, it is said: "The character of notice referred to as 'actual notice' is susceptible of subdivision; it may be either express or implied; that is, it may consist of knowledge actually brought personally home, or it may consist of knowledge of facts so informing that a reasonably cautious person would be led by them to the ultimate fact; . . . that which, if prosecuted with ordinary diligence, will furnish information of the (ultimate) fact." And in 20 Ruling Case Law, 346, 347, it is said: "Whatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand; and if he omits to inquire, he is then chargeable with all the facts which, by a proper inquiry, he might have ascertained. This, in effect, means that notice of facts which would lead an ordinarily prudent man to make an examination which, if made, would disclose the existence of other facts, is sufficient notice of such other facts. . . . Where there is a duty of finding out and knowing, negligent ignorance has the same effect in law as actual knowledge."

It was the duty of the foreman Squires, we think, as a matter of law, to look at the switch and to ascertain whether it was open or closed, or properly set, before giving the order and direction, by motion, to plaintiff to return to the cupola along the overhead track with the heavy ladle. Under the evidence herein, it is reasonable and logical to infer therefrom that, had the foreman looked at the switch, before giving the order and direction to plaintiff, he could and would have seen that it was not properly set, but was open and out of alignment; concededly, by his own testimony, the foreman, Squires, did not look at the switch to ascertain whether it was open or closed, and hence, as a matter of law, we think, the foreman Squires is chargeable with *actual notice* or knowledge that the switch

was open at the time he gave the order and direction to plaintiff to return to the cupola with the empty ladle.

We are of the opinion that the evidence was amply sufficient to entitle plaintiff to a submission of his theory of defendant's negligence to the finding and determination of the jury, and, therefore, that the trial court rightly refused defendant's requested peremptory instruction in the nature of a demurrer to the evidence.

II. Appellant assigns as error the giving of plaintiff's instruction numbered three, which submitted to a finding of the jury plaintiff's theory of defendant's negligence. That instruction reads:

"The court instructs the jury that if you find and believe from the evidence that on the 7th day of November, 1924, plaintiff was employed by the defendant as a common laborer and that he was placed under the orders and control of the foreman mentioned in the evidence, and that said foreman had charge over plaintiff and the work  to be performed by him for the defendant, as mentioned and described in the evidence, and that it was the duty of the plaintiff to perform any and all work ordered and directed by the said foreman, and if you further find and believe from the evidence that whenever plaintiff was required by defendant's foreman to get molten metal from the cupola or to take molten metal from the cupola to the molders the defendant's said foreman would set the switches for and give directions to plaintiff in the performance of his said work, and if you further find and believe from the evidence that at said time and place defendant's said foreman in charge of plaintiff ordered and directed plaintiff to deliver molten metal in a shank from said cupola to molders in one of defendant's departments and that at said time defendant's foreman had set the switch for plaintiff on the rail on which plaintiff was to deliver such molten metal with said shank or ladle from said cupola, and that after plaintiff had delivered a shank or ladle containing molten metal to said molders in said defendant's departments, the defendant's foreman in the performance of his duties and in charge of plaintiff and the work to be performed by plaintiff commanded, ordered and directed plaintiff to pull or push said shank or ladle as fast as possible on said track and over said switch to said cupola to be refilled with molten metal and that at said time said switch was open and not set in line with the rail or track leading from said department to said cupola for the moving of said ladle on said rail and that at said time said defendant's foreman signaled or motioned to plaintiff to come on over said track and switch with said ladle or shank and thereby assured plaintiff that he could proceed with safety over said track and switch and that plaintiff complied with the said order and command of the said foreman

and acted and relied upon the said signal of the said foreman and assumed that it was reasonably safe for him to proceed with said shank from said department to said cupola and did proceed with said shank upon said rail and track from said department to said cupola in a dog trot or a fast gait, and that when plaintiff arrived with said shank at said open switch said shank was suddenly stopped and the wheels of the carrier became jammed, causing the said shank to whirl around, knocking plaintiff from between the handles of said shank and against a pile of flasks and thereby directly caused the injuries to plaintiff described and mentioned in the evidence; and if you further find and believe from the evidence that at said time and place the defendant knew, or by the exercise of ordinary care could have known, that said switch was open and that said rail or track from said department to said cupola was not set in line and that said shank or ladle, if moved upon said rail or track, was likely to run into and upon said open switch and that it was unsafe and dangerous to move said shank or ladle upon said track at said time from said department to said cupola, and that by so ordering and directing and commanding plaintiff to move said shank over said track to said cupola at said time, if you find he was so ordered and directed to do, and in signaling plaintiff to proceed with said shank upon the said rail, if you find he was so signaled, the defendant failed to exercise ordinary care and was negligent, and if you further find and believe from the evidence that at said time plaintiff was exercising ordinary care for his own safety, that is to say, that degree of care that an ordinarily prudent person would exercise under like or similiar circumstances as mentioned in the evidence, then the plaintiff is entitled to recover for all the injuries thereby directly caused to be suffered by him, mentioned and described in the evidence, and your verdict must be for the plaintiff.''

The instruction is criticized by appellant upon several grounds. It is claimed that the instruction authorized a finding by the jury of facts which are not in evidence, in that it allowed the jury to find ''that said foreman would set the switches and give directions to plaintiff in the performance of his work;'' ''that at said time defendant's foreman had set the switch for plaintiff on the rail on which plaintiff was to deliver such molten metal with said shank or ladle from said cupola;'' ''that defendant's foreman . . . ordered and directed plaintiff to pull or push said shank or ladle *as fast as possible* on said track and over said switch to said cupola to be refilled with molten metal;'' and ''that at said time said switch was open and not set in line with the rail or track from said department to said cupola for the moving of said ladle on said rail and at said time.'' We find in the record herein substantial evidence to support

the submission of each and all of the foregoing hypothesized facts to a finding of the jury.

It is furthermore claimed that the instruction assumes the existence of facts not in evidence, but a close reading and analysis of the instruction discloses that the instruction assumes the existence of no facts whatsoever, but requires a finding by the jury of each and all of the facts hypothesized therein, which hypothesized facts, as we have just said, are supported by substantial evidence.

It is also claimed that the instruction is broader in its scope than the pleadings, in that the jury were authorized to find that "at said time said defendant's foreman signaled or motioned to plaintiff to come on over said track and switch with said ladle or shank *and thereby assured plaintiff that he could proceed with safety over said track and switch,*" whereas no assurance of safety was pleaded in the petition as a ground of defendant's negligence, or even mentioned as matter of inducement therein. The order and direction of the foreman, Squires, given to plaintiff by signal or motion, to come on with the empty shank was tantamount to an implied assurance that the track and switch were reasonably safe, and that plaintiff could proceed with safety thereover. [Keegan v. Kavanaugh, 62 Mo. 230, 232; Bane v. Irwin, 172 Mo. 306, 316; Clark v. Foundry Co., 234 Mo. 436, 450; Barnard v. Brick and Coal Co., 189 Mo. App. 417, 421; McCarver v. Lead Co. (Mo. App.), 268 S. W. 687, 689.] No harm was occasioned to appellant by the finding of such fact, although plaintiff did not plead assurance of safety as a distinct ground of negligence on the part of defendant. The implied assurance of reasonable safety to be inferred and drawn from the giving of the order and direction by the foreman, Squires, was a merely subsidiary matter, and not the primary and substantive matter of negligence upon, and for, which primary and substantive negligence plaintiff sought a recovery and submitted his case.

It is urged that the instruction was confusing and misleading to the jury in that it told the jury that the plaintiff is entitled to recover for all injuries "mentioned and described in the evidence." It is true that there was some conflicting evidence as to the nature and cause of plaintiff's injuries, plaintiff's evidence, on the one hand, tending to show that his injuries were proximately and directly caused by plaintiff being thrown upon the flasks or molds near the gangway of defendant's foundry by the swaying ladle, when the ladle carrier was abruptly stopped and derailed by the open switch, and defendant's evidence, on the other hand, tending to show that plaintiff's physical condition was either the result of disease or was the manifestation of an earlier injury received by plaintiff while in the service of another and different employer. The criticised instruction, however, after hypothesizing the facts in evidence and

requiring the jury to first find the existence of such facts, before allowing a recovery to plaintiff, then told the jury that plaintiff "is entitled to recover for all the injuries *thereby directly caused to be suffered by him, mentioned and described in the evidence.*" Furthermore, in another instruction upon the measure of damages, the jury were told that, in assessing plaintiff's damages, they should allow him compensation "for the injuries, if any, which he has sustained as a *direct result of the shank running into an open switch.*" And, at the instance and request of defendant, the court instructed the jury that "the burden of proof is on the plaintiff to show that the injury complained of *was caused by some negligent act of the defendant,* and unless the jury believe . . . that the injury was the *direct result of such act,* they will find a verdict for defendant." We think that the jury could not have been misled or confused by the language of the criticised instruction, as respecting the injuries for which plaintiff was entitled to a recovery; and, furthermore, when all the instructions are read and viewed as a single charge to the jury, they clearly advise the jury that compensation could be awarded to plaintiff for such injuries only as were directly and proximately caused by, and resulted from, defendant's negligence, if the jury should find from the hypothesized facts in evidence that defendant was negligent.

Plaintiff's instruction numbered three was well within the scope of both the pleadings and the evidence, and we find no error therein. No claim of error other than those herein considered and ruled is made by appellant.

Finding no reversible error in the matters complained of, or upon the record before us, the judgment *nisi* must be affirmed, and it is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.