O. P. Keyes v. Chicago, Burlington & Quincy Railroad Company, Appellant.—31 S. W. (2d) 50.

Division One, September 4, 1930.

238

*H. J. Nelson* and *Douglas W. Robert* for appellant.

240

*Charles P. Noell* and *Hensley, Allen & Marsalek* for respondent.

SEDDON, C.—Action by plaintiff (respondent here) for the recovery of damages for personal injuries alleged to have been suffered while plaintiff was a passenger on one of defendant's passenger trains, and alleged to have been directly and proximately occasioned by a collision between the train upon which plaintiff was a passenger and one of defendant's locomotive engines, said collision occurring in the defendant's railroad yards at Hannibal, Missouri, on the morning of August 17, 1925.

The petition is grounded upon the general negligence of the defendant railroad carrier, that is, upon the doctrine *res ipsa loquitur;* and alleges that plaintiff was a passenger for hire upon defendant's south-bound passenger train, which train was caused and permitted to collide head-on with a northbound locomotive engine of defendant railroad carrier, "through the negligence of the defendants, and without fault on the part of the plaintiff, with great force and violence, thereby causing plaintiff to be thrown in and about the car on which plaintiff was a passenger and to cause plaintiff to suffer serious, painful and permanent injuries," which injuries are thus described and specified in the petition:

"The vertebrae of plaintiff's spine in the upper portion thereof and the neck were fractured and dislocated and the ligaments, tendons and tissues connected therewith severely wrenched, torn and strained. Plaintiff received a severe blow in the face in the region of the nose and eye causing his face to be cut and bruised. Plaintiff suffered a concussion of the brain, both elbows were severely bruised and the bones, ligaments and tendons thereof bruised, torn and injured; the bones of plaintiff's left hand were fractured; that by reason of said injuries plaintiff has suffered from nervous shock, chronic inflammation of the bones and joints of the spine, dizziness, headaches, insomnia, restlessness, irritability, bladder trouble and lack of appetite. The optic nerves have become atrophied and the

244

vision of his eyes impaired and diminished, all of which injuries are permanent and from which plaintiff has suffered, does and must in the future suffer pain of body and anguish of mind; that he has been permanently incapacitated from working and earning a livelihood and has and must in the future lose the earnings of his labor as a laborer of $90 per month.''

The petition joined, as codefendants with the defendant railroad carrier, two individuals, T. A. Briscoe and J. P. Murphy, who are alleged to have been employees of the defendant carrier in charge of the colliding engines of defendant carrier. ·

The defendant railroad carrier filed a separate answer, denying generally each and every of the averments of the petition. The individual defendants, Briscoe and Murphy, filed a joint answer, denying generally each and every of the averments of the petition.

The cause was tried to a jury. The evidence is uncontroverted by defendants that plaintiff was a passenger for hire on defendant carrier's passenger train, and that a collision occurred on the morning of August 17, 1925, between the train in which plaintiff was riding and a locomotive engine of defendant carrier. It is indisputable under the evidence adduced that plaintiff sustained some injuries as the direct and proximate result of the collision, but there is a sharp conflict in the evidence as to whether plaintiff sustained the serious and permanent injuries he claims to have suffered as the direct and proximate result of the aforesaid collision.

At the close of all the evidence, the trial court peremptorily instructed the jury in writing that, under the pleadings and the evidence, plaintiff is not entitled to recover against the individual defendants, Briscoe and Murphy; whereupon, and before the submission of the cause to the jury, counsel for plaintiff announced, in open court, and with the approval of the trial court (as disclosed by the record before us), that plaintiff desired to take an involuntary nonsuit as against the individual defendants, Murphy and Briscoe, with leave to move to set the same aside. Judgment was entered by the trial court, under circumstances to be hereinafter recited, that ''plaintiff have and recover of the defendant, Chicago, Burlington & Quincy Railroad Company, a corporation, the sum of ten thousand ($10,000) dollars, together with the costs of this suit, and have therefor execution.'' After unavailing motions for a new trial and in arrest of judgment, the corporate railroad defendant was allowed an appeal to this court.

Appellant assigns error on the part of the trial court as follows:

''(1) The court erred in failing to enter judgment for the defendant on the verdict which nine jurors had affirmed on the poll; (2) the court erred in ordering the jurors to retire and bring in another verdict, after their verdict had been recorded, and they had

been discharged; (3) the court erred in receiving and recording the third verdict and entering judgment thereon against the defendant Railroad Company; (4) the court erred in permitting Dr. Henry to testify to an injury not pleaded; (5) the court erred in giving (plaintiff's) Instruction No. 1; (6) the court erred in giving (plaintiff's) Instruction No. 2; (7) the verdict last received by the court was excessive.''

The several assignments of error will be discussed and ruled in the order as above stated.

I. The first three assignments of error may be grouped together, and considered and ruled as a single assignment. They relate to the reception by the trial court, and the filing and recording, of the verdict of the jury upon which the trial court entered judgment in favor of plaintiff, and against the appealing corporate defendant. The first three assignments of error are predicated upon the following circumstance and occurrence, as disclosed by the record proper, abstracted herein as follows:

''The cause was, at the October term, 1926, of said court, and on November 1, 1926, under the rules of court, duly assigned to Division No. 9 of said court, Hon. George E. Mix, Judge, presiding, and was tried November 1, 3 and 4, 1926, at said term.

''Wednesday, November 3rd, the jurors retired to consider of their verdict, and not having agreed upon a verdict at the hour of adjournment, it was ordered by the court that said jurors return into court a sealed verdict.

''And on Thursday, November 4, 1926, and at said October term, 1926, the following proceedings were had, as appears by the record of said court, as follows:

''Now at this day come again the parties hereto by their respective attorneys, comes again the jury, heretofore sworn and impaneled herein. Thereupon said jury returned into the court a sealed verdict, and being opened by the court, the jurors aforesaid, upon their oath as aforesaid, say:

'' 'We, the jury in the above entitled cause, find in favor of the defendant, on the issues herein joined.

'' 'EARL S. QUINN, Foreman.

'' 'EARL S. QUINN, ROBERT A. SMITH, CHARLES HEADEN, CHARLES L. SPENCER, FRED A. SCHNEIDER, LOUIS BARRY, JOHN BREITENBACH, CHAS. W. BEESON, W. F. McNORTON.'.

''Upon being duly polled said nine jurors each answered that it was his verdict.

''Whereupon, said jurors were dismissed, but were required by the court to remain in the courtroom.

"Thereafter, and before said jurors had left the courtroom, the court found in the envelope in which said verdict was also found sealed, and with the same, the following verdict:

" 'We, the jury in the above cause, find in favor of the plaintiff, on the issues herein joined and assess plaintiff's damages at the sum of ten thousand dollars.

" 'EARL S. QUINN, Foreman.

" 'EARL S. QUINN, LOUIS BARRY, FRED A. SCHNEIDER, W. F. MC-NORTON, CHARLES HEADEN, CHAS. W. BEESON, JOHN BREITENBACH, ROBERT A. SMITH, CHARLES L. SPENCER.'

"Thereupon, the court again called all of the jurors to the bar and refused to receive either of said verdicts for the reason they were contradictory, and instructed all of said jurors to again retire to their room and return a verdict. Whereupon, all of said jurors retired to their room, and again coming into court returned a verdict, and upon being read as aforesaid, upon their oaths as aforesaid, say:

" 'We, the jury in the above cause, find in favor of the plaintiff, on the issues herein joined and assess plaintiff's damages at the sum of ten thousand dollars.

" 'EARL S. QUINN, Foreman.

" 'EARL S. QUINN, LOUIS BARRY, FRED A. SCHNEIDER, W. F. MC-NORTON, CHARLES HEADEN, CHAS. W. BEESON, JOHN BREITENBACH, ROBERT A. SMITH, CHARLES L. SPENCER.'

"And upon being polled said nine jurors each answered that said verdict was his verdict, and which said last named verdict was received by the court and duly filed.

"Wherefore, it is considered and adjudged by the court that plaintiff's cause of action be and the same is hereby dismissed as to defendants T. A. Briscoe and J. P. Murphy, that said defendants be discharged and go hence without day.

"It is further considered and adjudged by the court that plaintiff have and recover of the defendant, Chicago, Burlington & Quincy Railroad Company, a corporation, the sum of ten thousand ($10,000) dollars, together with the costs of this suit, and have therefor execution.

"Verdict and instructions filed."

The bill of exceptions, as abstracted, contains an almost identical recital of the aforestated circumstance and occurrence, but shows the taking and saving of an exception on the part of the corporate defendant to the order and ruling of the trial court in refusing to receive either of the two contradictory forms of verdict, and in recalling the jury and instructing them "to again retire to their room and return a verdict."

It is the insistent claim and assertion of the appellant that, the jury having returned into open court a written paper, duly signed by nine jurors, in the form of a verdict for the defendant, and the jury having been polled thereon in open court, and each of the nine jurors who signed the form of verdict in favor of defendant having answered upon the poll that such was his verdict, the poll of the jury was therefore conclusive, and, hence, that the form of verdict in favor of defendant had the force and legal effect of a recorded verdict, and the trial court erred in not entering a judgment thereon in favor of the corporate defendant. It is furthermore contended by appellant that the record proper discloses upon its face, by positive recital, that, immediately following the return by the jury of the form of verdict in favor of the defendant, signed by nine jurors, and immediately after the polling of the jury upon said signed form of verdict, the jury were discharged by the trial court, and therefore their powers and functions as jurors in the cause ceased and terminated, and the trial court was without power or authority to recall and reassemble the discharged jurors and direct them to again consider the cause and to return another verdict therein.

The question thus presented for our consideration and determination is somewhat unique, especially in view of the fact that there is nothing to be found in the record before us which explains, or throws light upon, the reason for the action of nine of the jurors in signing two conflicting, contradictory, and incompatible, forms of verdict.

We are not impressed with the force of appellant's argument and contention that the signed form of verdict in favor of defendant, upon which form of verdict the jury were polled, constituted (in fact or in law) a *recorded* verdict, upon which *recorded* verdict the trial court was bound, under the established principles of law, to enter a judgment for the defendant. The circumstance and occurrence, as recited and spread by the trial court upon the record in the cause, must be viewed and considered by us in the light of the whole and entire record. The record specifically and positively recites that the trial court "refused to receive *either* of said verdicts for the reason they were contradictory." Thus, the record of the court, by the positive recital aforesaid, refutes the claim of appellant that the signed form of verdict in favor of defendant (notwithstanding that the jury were polled thereon) was actually received by the court as the verdict of the jury, or that such form of verdict was actually recorded as the verdict of the jury. The record expressly and positively declares that the trial court refused to receive the signed form of verdict in favor of defendant, as well as the signed form of verdict in favor of plaintiff, as originally returned by the jury enclosed and sealed

in the same envelope, and, there being no reception by the trial court of either of the two contradictory and incompatible forms of verdict, none was then recorded, or rightly could have been recorded, as the verdict of the jury.

In Newton v. Railroad Co., 168 Mo. App. 199, 201, it was aptly said by Trimble, J., speaking for the Kansas City Court of Appeals: "The judgment is not rendered until after the verdict has been *received and recorded*, and the verdict as *written and recorded* is the basis, and the *only* basis, of the judgment."

In the more recent case of Lummi Bay Packing Co. v. Kryder (K. C. C. A.), 263 S. W. 543, 545, it was earnestly contended by the appellant therein (as in the instant cause) that a signed form of verdict, which the trial court had refused to receive as the verdict of the jury, should have been used by the court as a basis of correcting a later verdict, which was received by the trial court and duly recorded, and upon which later verdict a judgment was entered. Said the same Court of Appeals, again speaking through Trimble, P. J., in answering such contention: "The contention seems to be made, or rather intimated, that it is conceded that the verdict when first returned contained a finding on the counterclaim and, therefore, the court could and should, under the circumstances, correct the [later] verdict. There are two answers to this [contention]. In the first place, the fallacy is in assuming that the first paper brought in was a *verdict*. In one sense it may have been, if we mean that it was, at that moment, the answer and finding of the jury; but it did not become a *verdict on which a judgment could be rendered*, for it was never *received and recorded*." [Italics ours.]

In 27 Ruling Case Law 841, the applicable rule of law is thus stated: "The delivery and recording of a verdict are essential to its validity, because it is not perfected until recorded, and a trial cannot be considered as ended until this is done. The fact that the verdict has been announced. and has been, as announced, entered in the minutes of the clerk, is not that recording which makes the announcement and the clerical act the fixed and unalterable verdict of the jury. Until the final interpretation is made by the clerk and assent given, express or tacit, and the jury dismissed and become no more a jury in the case, the verdict within certain limits is within the power of the jury, and to a certain extent within the direction of the court."

The signed form of verdict in favor of the defendant was neither received by the trial court in the instant cause, nor was such form of verdict "*recorded*," within the meaning of that term as used in the law, so as to constitute a true verdict of the jury, upon which a judgment for defendant could have been entered. To hold otherwise would be to do violence to the clear and positive recitals of the

record of the trial court, as abstracted and presented to this court in the instant cause. Consequently, there is no room or reason, upon the record before us, for sustaining the appellant's contention that the trial court erred in failing to enter a judgment for the corporate defendant herein.

It is contended by appellant, however, that the record discloses by positive recital that, immediately after the poll of the jury upon the signed form of verdict in favor of defendant, the jury were formally and finally discharged by the trial court, notwithstanding that the record also recites that the jury were required by the court to remain in the court-room; hence, it is urged that the jury were *functi officio*, and were without power or authority to modify, amend, alter, or correct the signed paper in the form of a verdict in favor of defendant (upon which they were polled and which they affirmed as their verdict), or to return another verdict in the cause, and the trial court was equally without power or authority to recall and reassemble the discharged jury, and to direct them to retire to the jury room and return "a verdict" in the cause. Appellant's contention is mainly predicated upon the word "dismissed," as used in the record, it being asserted that the words "dismissed" and "discharged" are synonymous, and since the record positively recites that the "jurors were dismissed," therefore the record can only be construed and held to mean that the jurors were finally and formally discharged by the court from the performance of any further functions and duties in the cause, and their subsequent action was a nullity.

It may be conceded (as contended by appellant) that the established law is to the effect that, after the verdict of a jury in a cause is actually received by the trial court, and is actually recorded, and the jury are formally and finally discharged by the court, the jurors, as such, are *functi officio* in the cause, and are without power or authority to materially and substantially alter or amend their recorded verdict.

In 27 Ruling Case Law 895, it is said: "The power of a jury over their verdict, unlike that of the court, ceases on their discharge. With their assent to the verdict as recorded their functions with respect to the case cease and the trial is closed, and after the verdict is received and the jury discharged the control of the jury is at an end, and they cannot be recalled to alter or amend it."

The same text, however, also states the established law to be (27 R. C. L. 890): "The law allows the jury all reasonable opportunity, before their verdict is put on record and they are discharged, to discover and declare the truth according to the judgment. Before they have been dismissed from their relation to the case as jurors in it, their power over their verdict remains, and their right to alter it so

as to conform to their real and unanimous intention and purpose. And it may be stated generally that when a jury return an informal, insensible, or a repugnant verdict, or one that is not responsive to the issues submitted, they may be directed by the court to reconsider it and bring in a proper verdict; and this may be done with or without the consent of counsel and should be done whether requested or not. . . . The practice is really only an application of the settled rule that until the verdict has been recorded, or the jury have been discharged as unable to agree, their connection with the case has not come to an end.''

The established rule is thus stated in 2 Thompson on Trials (2 Ed.) sec. 2633, page 1918: ''If the jury bring in a verdict which is informal, it is within the power of the court, at any time before the verdict is recorded and the jury are discharged, to send them out and require them to put the verdict in proper form, and to advise them how to do it. It is equally clear that the court may reduce the verdict of the jury to proper form and cause it to be read to them, and that if they assent to it, it will be their verdict. Where the jury have signed and sealed their verdict and delivered it to the clerk after the adjournment of the court, and have then dispersed, they may, when called to the bar the next day, before their verdict is recorded, be sent back to correct it, if it is found to be informal.''

In Kreibohm v. Yancey, 154 Mo. 67, 82, a replevin action, the jury returned into court a signed form of verdict, which the clerk of the court read to the jury, and then asked the jurors whether such was their verdict, and the jurors answered in the affirmative. The trial judge then directed the sheriff to adjourn the court to the following day, and while the sheriff was in the act of making the announcement of adjournment, and just before the announcement was completed, the foreman of the jury arose and spoke to the court, whereupon the court signaled the sheriff, and the sheriff stopped his announcement, and the jury being still in their seats, the court inquired of the foreman what he desired to say. The foreman then said there was another verdict also returned by the jury, and the court thereupon directed the clerk to hand the other verdict to the court, who inquired of the jurors respecting the two signed forms of verdict, in order to ascertain their true verdict. Whereupon the court directed the foreman to correct the signed form of verdict first returned by the jury, so as to make it include the entire finding of the jury, which was done by the foreman in the court-room and in the presence of the court and the jury. The verdict, as so corrected, was read to the jury by the clerk, who inquired of the jurors whether such was their verdict, and the jurors answered in the affirmative. Whereupon the court directed the clerk to enter the verdict, as corrected, and the court entered judgment thereon. The ap-

pealing party, against whom judgment was entered on the corrected verdict, assigned in this court, as ground for the reversal of the judgment, that the court *nisi*, after having accepted from the jury a signed form of verdict as their verdict in the cause, and after having directed the sheriff to announce the adjournment of the court, committed reversible error in permitting the jury to amend and correct their original verdict and in receiving the corrected verdict from the jury. Said this court, in overruling the assignment of error: "It sufficiently appears on the face of the proceedings in court upon the return of the jury with their verdicts herein fully set out, that their return was such as ought to have been amended, that it was in fact properly amended, and that the amendment was made in open court in the presence and with the assent of the jury before entry, and before the court did in fact adjourn, and we find no error in this proceeding for which the judgment should be reversed. [Long v. Talley, 91 Mo. 310; Cattell v. Dispatch Pub. Co., 88 Mo. 356; State v. Chumley, 67 Mo. 41; State ex rel. v. Rombauer, 44 Mo. 590; Henley v. Arbuckle, 13 Mo. 209.]"

A situation almost identical with that presented in the instant cause was presented for decision to the St. Louis Court of Appeals, in Hary v. Speer, 120 Mo. App. 556, wherein the record disclosed the following: The jury, during the noon recess of the trial court, returned a sealed verdict, which the court opened on convening the afternoon session, and the first paper that caught the eye of the court was a form of verdict in favor of the defendant, signed by the foreman of the jury. Assuming that such signed paper was the verdict of the jury, the court looked no further in the envelope from which the signed paper had been removed, and directed the clerk to read the signed paper to the jury, who asked the jurors if such was their verdict. The court, however, did not observe what occurred when the clerk inquired of the jurors whether the signed paper so read to them was their verdict. After the clerk had read the signed paper to the jury, the court directed the jury to take seats in the body of the court-room. About five minutes thereafter, and while the jury remained seated in the body of the court-room, the clerk called the court's attention to the fact that there was another paper, or form of verdict, sealed and enclosed in the envelope, signed by the foreman of the jury, finding in favor of the plaintiff in the sum of $1220, and the clerk informed the court that, when the clerk, after reading to the jury the first signed paper, had asked them if such was their verdict, the jury seemed surprised, and one of the jurors slightly nodded his head, whereupon the clerk assumed that the signed paper so read to the jury was the verdict of the jury. Thereupon the court directed the sheriff to recall the jurors to the box, and on being interrogated by the court which of the two signed

forms of verdict was their true verdict, the foreman of the jury arose and stated that the verdict for the plaintiff for $1220 was the verdict that the jury had rendered. The court thereupon directed the clerk to read to the jury the signed form of verdict in favor of the plaintiff for $1220, and, in response to a question addressed to them by the court, the jurors all responded that such was their verdict, and the same was received by the court as the verdict of the jury in the cause, judgment was entered thereon, and no other verdict was recorded. It was strenuously contended by the appellant therein (as is contended in the instant cause) that the jury had been discharged, and that the court, with or without the aid of the jury, was powerless to correct or change the verdict returned by the jury, as evidenced by the first signed paper removed from the sealed envelope and read to the jury, and that judgment should have been entered for the defendant upon the signed form of verdict first read to the jury. Speaking to such contention, the St. Louis Court of Appeals, speaking through NORTONI, J., said: ''It is argued by defendant that the verdict which the court first discovered among the papers, upon opening the sealed envelope, and read to and in the presence of the jury, is the verdict which the court should have directed filed and recorded in the case and upon which it should have entered judgment. It is urged that the court is without authority to accept the true verdict, as it did, after the first was read to the jury. We are not impressed with the argument advanced. The defendant cites many authorities in support of the proposition, to which we fully accede, that after the jury is discharged by the court, the court has no power to recall it to further consider the case or change or correct the verdict, inasmuch as the jury is without further power over the case after its discharge. [Citing cases.] The rule has no application to the facts of this case, however, for two very good and sufficient reasons, the first of which is that there is nothing in the record showing that the jury had been discharged and second, the jury were not required by the court to make any change in their verdict, nor to further consider the case in any respect. It is shown that the court found first, upon opening the sealed envelope, a paper in the form of a verdict in favor of the defendant, and signed by one of the jurymen as foreman. The court looked no further and passed it to the clerk, who read the same in the presence of the jury, and in answer to the query if this was their verdict, one juror nodded his head while the others looked surprised. There is nothing before the court to show that the same was either filed or recorded by the clerk, nor is it made to appear that the court directed it to be filed or entered of record or that the court discharged the jury. On the contrary, it is shown not to have been entered of record. It is true the court directed the jury t

take seats in the body of the court room. This may or may not have been done with the purpose of discharging them from the case. . . . Now, in this state of facts, was it proper for the trial court to call upon the jury, all of the members of which were still present and not formally discharged, to aid it in ascertaining which of the two papers was the true verdict? We are persuaded that it was manifestly proper under these circumstances for the court to permit the jury to designate which was the true verdict. In the first place, it is abundantly well settled that the trial court may, before discharging the jury and before recording the verdict, require the jury to correct errors in or to remove obscurities and ambiguities therefrom. The rule is that the jury, under the direction of the court, remain in control of their verdict until the same is announced and recorded unless they are discharged by the court prior to that time, in which event, of course, their authority ceases with respect to the case. The verdict is not recognized as final unless the jury are discharged, until it is announced and recorded. [Citing cases.] It is quite clear that this is the view of the law entertained by our Supreme Court as appears from the ruling in the case of Kreibohm v. Yancey, 154 Mo. 67-79-82, 55 S. W. 260, when the facts upon which that adjudication is rested, are studied. In that case, a verdict had been returned by the jury. It had been viewed by the judge and announced in open court as the verdict and the jury were thereupon evidently dismissed, although nothing appears showing their dismissal or discharge, but it does appear that after the verdict was announced, the court directed the sheriff to adjourn court, and while the sheriff was crying, 'Oh Yez, Oh Yez,' a juror directed attention to the fact that there was yet another verdict. The court then, before adjournment, looked further into the verdicts and after propounding certain questions to the jury, directed them to redraft their verdict and make it conform to their manifest intention, which was done. The Supreme Court held this to be proper and it is quite clear that that court did not regard the facts that the trial court had caused the verdict to be read and announced and the sheriff to proceed toward the adjournment of the court and the consequent dismissal of the jury as operating its discharge within the meaning of the law, for had the jury been discharged, no corrected verdict could have been had, as was done. There are some similarities in both the facts and principles of that case and the case at bar and it may be considered an authority here. . . . The defendant insists that while no formal order discharging the jury was made, the jury was in fact dismissed and ordered to take seats in the body of the court room after the first verdict was announced and that in truth this dismissal was and is a discharge from the case as much so as is ever had in the trial court until the record proper is made up by the

clerk; that even though the verdict was not recorded, the jury were in fact discharged and therefore they had no further power over the verdict or any connection with the case. . . . For the sake of argument, let us concede the fact contended for by defendant, that the verbal order of the court addressed to the jury, directing them to be seated in the body of the court room, amounted to a discharge from the case. Even then, as we understand the law, the court would have authority to amend the verdict so as to make it conform to the real intention of the jury, provided it in no manner trespassed upon the domain of that body. Such amendments are permitted and have been from the early history of the law, even after lapse of the term at which the case was tried and even after writ of error and joinder in error. [Citing cases.] . . . It is manifest that the court, predicating its action upon the principle of the adjudications supra, could, from the record and evidence before it, acting as it did almost simultaneously with the occurrence, while the jury were still in its presence, being guided by the unanimous voice of the jury pointing out the verdict which manifested their intention, adopt or substitute that verdict as an amendment of that which was a result of error, even though the jury had been discharged.''

In the very recent case of Glaves v. Old Gem Catering Co., 18 S. W. (2d) 564, 567, which was an action to recover damages for personal injuries, the record disclosed that the jury handed to the clerk of the trial court two separate papers, or forms of verdict, both signed by the foreman of the jury, one paper finding in favor of plaintiff and assessing her damages at the sum of $7,500, and the other paper finding for defendant. Thereupon the trial court informed the jury that they had not arrived at a proper verdict, and asked the jury which of the two signed forms of verdict was the one they intended to return. The foreman and several of the jurors answered that the verdict in favor of plaintiff was the verdict of the jury. The trial court then called the foreman to the bench and directed him to erase, and he did erase, his name from the form of verdict in favor of defendant, which was done in open court, in the presence of all of the jury, the counsel for the respective parties to the action, and the officials of the court. The verdict for plaintiff was then received by the court, filed, entered, and recorded as the verdict of the jury, and judgment was entered thereon. Defendant assigned error in the reception and recording of the verdict, and the entering of a judgment thereon. Said the St. Louis Court of Appeals, in denying the assignment of error: ''We think it was clearly the duty of the court, when the jury attempted to return a patently ambiguous and defective verdict, to call their attention to the error, so that the same could be corrected, or, more appropriately stated,

to inquire of the jurors, all of whom were still present in court and . undischarged, which of the two papers was the true verdict. In this instance there was absolutely no alteration of, or change in, the true verdict which had been actually agreed upon, signed, and delivered into court; and, while the incident casts some slight reflection upon the jury system, it nevertheless speaks well for the credit of the judge that, acting simultaneously with the occurrence as he did, and in the presence of counsel for both parties, he took prompt steps to ascertain from the jury what was the true verdict, so that the same might be duly received and recorded, and judgment rendered thereon. [Kreibohm v. Yancey, 154 Mo. 67; Hary v. Speer, 120 Mo. App. 556; Christopher v. White, 42 Mo. App. 428; Smith v. Greer, 216 Mo. App. 155; Turley v. National Ammonia Co. (Mo. App.), 299 S. W. 53.]''

In Victor Sewing Machine Co. v. Heller, 44 Wis. 265, 274, the jury returned into court a verdict, and the court, after receiving the verdict, handing it to the clerk, and having it read by the clerk to the jury, asked the jurors if it was their verdict, and receiving an affirmative reply, the court ''informed the jury that they were discharged from further consideration of the case.'' A few minutes afterwards, and while the jury were yet in their seats, and before they had separated, the court called their attention to certain imperfections in the verdict, inquiry was made of the jurors respecting their intention, the verdict was redrafted in conformance with the intention of the jury, and, as redrafted, was signed by the foreman and was declared by all of the jurors to be their verdict, whereupon the amended or redrafted verdict was received by the trial court and recorded, and judgment was entered thereon. Appellant assigned error in the reception of the amended verdict, and in the entry of judgment thereon by the trial court, all occurring after the court had ''informed the jury that they were discharged from further consideration of the case.'' Said the Supreme Court of Wisconsin, in ruling the assignment: ''We do not think there was any error committed by the court with respect to the verdict. It is true, the record shows that the judge, after the delivery of the verdict, said to the jurors that they were discharged; but immediately thereafter, before they had left their seats or communicated with anyone, the judge called their attention to the imperfections in the verdict, and, having put the same in the form in which the jurors affirmed they intended it to be, it was signed by the foreman, and, as so amended, declared by the jury to be their verdict. The judges of the circuit courts are frequently called upon to perform a work of this kind. Jurors, unacquainted with the forms of law, very often deliver very informal verdicts; and, where their intentions are clearly indicated by such informal verdict, it becomes the duty of the

court to put it in proper form before it is entered as the verdict of the jury. It is in furtherance of justice that the judge should do so.''

In Junion v. Motor Co., 186 Wis. 298, 301, an action for recovery of damages for personal injuries, the jury returned a general verdict for plaintiff, assessing the amount of his damages, and the jury also returned, conformable to the Wisconsin practice, a special verdict, answering certain interrogatories, propounded to the jury by the court, respecting the issues submitted. The special verdict conflicted, in a material respect, with the general verdict of the jury. After the return by the jury of the general and special verdicts, a colloquy took place between the foreman of the jury and the trial judge respecting the answer made by the jury, in their special verdict, to one of the interrogatories propounded to them. When the colloquy occurred, some of the jurors had left the jury box, but none of them had left the court-room. The trial judge directed the jurors to be recalled and reassembled, and sent them to the jury room for the purpose of permitting them to correct the answer to the interrogatory as made in the special verdict. Error was assigned in such action of the trial court. Said the Supreme Court of Wisconsin, in ruling the assignment on appeal: ''The defendant claims that the court erred in calling the jury together for the purpose of making the correction: It insists that the jury was discharged and that there was no power in the court to call them together again for the purpose of amending their verdict to conform with the facts as declared by the foreman that the unanimous agreement was that the answer to the fifth question [or interrogatory] should be 'No.' This is not a case where the jury seeks to impeach the verdict rendered, but a case where, before they finally leave the court-room, they informed the judge that an error had occurred in reducing their agreement to writing. It is well settled law both in our own jurisdiction and in other jurisdictions that there is an inherent power in the court to permit such errors to be corrected. . . . In this case, the jury was sent out to the jury room for the purpose of making the correction called to the attention of the court by the foreman. It is evident that it must have been the unanimous view of the jury that question number 5 should have been answered in the negative, otherwise they would not have agreed upon a verdict and returned to the court within three minutes. Whether the correction is made in the jury box or in the jury room is quite immaterial when it appears that there has been a mistake in reducing the agreement of the jury to writing and a correct verdict is returned. Such correction of the mistake may be made in the court-room in the presence of the court, or *the court may in its discretion send the jury to the jury room,* there to make the correction and return the verdict which

they had agreed upon and which they intended to make." [Italics ours.]

In Levine v. Street Railway Co., 177 Mass. 204, an action in tort for personal injuries, the foreman of the jury, by mistake, signed a form of verdict in favor of the plaintiff, without any statement therein of the amount of damages awarded. On inquiry of the trial judge, it was ascertained that the jury, before separating, had found for the defendant, and that the foreman had signed the wrong paper, purporting to express the jury's verdict. The jury were then told by the court that, if they wished, they might retire and correct any mistake. They did so, and brought in a verdict for the defendant. It was ruled by the Supreme Judicial Court of Massachusetts, upon a certification of the question by the trial court to the latter court for determination, that the proceedings were within the authority of the trial court, and that judgment should be entered upon the verdict for the defendant. In ruling the question, the appellate court said: "There can be no doubt of the power of the judge in the court below to send out the jury to find a proper verdict, as the verdict which they had sealed up before separating was a defective one. [Citing numerous cases.]"

In Charles, Admr., v. Railway Co., 230 Mass. 536, 544, an action in tort for recovery of damages for the death of plaintiff's intestate, the cause was submitted to a jury upon eight special questions, or interrogatories, it being agreed by the parties to the action that the answers of the jury to the special interrogatories should be regarded as a sealed verdict of the jury. The jury returned the sealed verdict into court on Thursday, but had failed to agree upon an answer to one of the eight interrogatories. The jury separated on Thursday, but reassembled on the next court day, which was the following Monday, at which time the trial court ordered the jury to return to their room and consider the unanswered special interrogatory further, which the jury did, agreeing upon an answer thereto, upon which, as a basis, the court ordered a recovery for the plaintiff, in accordance with the special verdict of the jury. The propriety of the action of the trial court came before the Supreme Judicial Court of Massachusetts, upon exceptions duly taken to the action of the trial court, and the appellate court, in overruling the exceptions taken, said: "While the interval between the separation and the reassembling of the jury was longer than has been intimated in some cases was permissible, Winslow v. Draper, 8 Pick. 170, there appears to be no reason to think that justice has not been done or that the defendant has suffered any prejudice. . . . The conduct of the judge before directing the jury to consider the question further imports a finding that nothing had occurred during the interval of separation to imperil in the slightest degree the purity and ab-

solute impartiality of the jury. The case at bar comes within the language of Chief Justice SHAW in Commonwealth v. Roby, 12 Pick. 496, at page.516: 'It is not every irregularity which will render the verdict void and warrant setting it aside. This depends upon another and additional consideration, namely, whether the irregularity is of such a nature as to affect the impartiality, purity and regularity of the verdict itself.' "

In Pritchard v. Hennessey, 1 Gray (67 Mass.) 294, 296, the jury returned a sealed verdict, which the trial court refused to receive, and sent the jury out again to put their verdict into proper form. Afterwards the jury returned a second verdict, which also was unsatisfactory to the trial court, as not embracing all of the issues submitted, and the jury were sent out a third time, over plaintiff's objections, and afterwards returned a third verdict. The last verdict was received and accepted by the trial court, and the last verdict was the only verdict recorded, judgment being entered thereon. Exceptions were taken by plaintiff to the action of the trial court, which exceptions were overruled by the appellate court, the court announcing the following conclusion: "The practice of sending out a jury, when they return a finding that is absurd or defective, has existed more than four hundred years. [Citing authority.] . . . It is objected by the plaintiff, that the jury could not be sent out in this case, because they had separated, after their first finding, before they came into court. But the cases cited by him do not support this objection; and the contrary appears from the cases of Edelen v. Thompson, 2 Har. & Gill, 31; Wolfran v. Eyster, 7 Watts, 38; and Sutliff v. Gilbert, 8 Ohio, 409."

In Warner v. New York Central Railroad Co., 52 N. Y. 437, 440, it is said by the New York Court of Appeals: "There is no doubt but that a jury after giving in a verdict may, before it is recorded, be sent back to reconsider it; not only to correct a mistake in form, or to make that plain which was obscure, but to alter it in substance if they so determine and agree. [Citing cases.] And where a jury has been authorized to bring in a sealed verdict, and has found it, put it in writing, sealed it, has separated, has the next morning come together in court and given it in; if the verdict be defective, the court may direct them to retire again and reconsider it. [Citing cases.]"

In the light of the juristic decisions above cited, should we hold, upon the record before us in the instant cause, that the jury were formally and finally discharged by the trial court, within the meaning of the law, after having been polled on the signed form of verdict in favor of the defendant, and before the discovery by the court of another signed form of verdict, in favor of plaintiff, sealed in the same envelope from which the first form of verdict had been re-

moved; and should we hold that the jurors became *functi officio* in the instant cause, and therefore were powerless to correct their manifest mistake in reducing their true finding and verdict to writing; and that the trial court was equally powerless to correct the jury's manifest mistake? We are persuaded by the adjudications of the appellate courts of this and other jurisdictions that the question should be answered in the negative. It may have been that the trial court (acting, as the record clearly discloses, under the mistake that the jury had returned a single signed form of verdict expressing their true finding and verdict) intended to discharge the jury from further attendance as jurors in the cause, although the fact that the court required the jury to remain in attendance in the court-room, as recited in the record herein, rather tends to indicate that the court had not then finally and formally discharged the jury, and that the trial had not then been actually terminated. Be that as it may, however, the record conclusively shows that both the court and the jury were acting at the time under a mutual mistake: the court, under the mistake that there was but one, single form of verdict returned by the jury, enclosed and sealed in the envelope; and the jury, under the mistake that they had reduced to writing and returned in the sealed envelope a signed form of verdict which expressed their true finding upon the issues submitted to them. Immediately upon the discovery of the mutual mistake, the trial court promptly recalled the jury to the bar, before the jurors had dispersed and separated, and the jurors meanwhile having been within the continuous view of the court, whereupon the court very properly told the jury that neither of the signed forms of verdict enclosed in the sealed envelope could be received by the court as the verdict of the jury, for the reason that the two signed forms of verdict were contradictory. In effect, the court told the jury that they must express their true finding and verdict by signing and returning only one of the forms of verdict, and not both; in other words, the court merely required that the jury should designate which of the two signed papers was their true verdict. There was not the slightest intimation by the trial court respecting which of the two forms of verdict the jury should designate as their true finding and verdict, and there was nothing coercive or suggestive in the action and conduct of the court. The record before us imports that nothing had occurred prior to the recalling of the jury which tended in the slightest degree to affect or influence the impartiality and integrity of the jury, and it must be presumed from the record before us that no outside influences were exerted over the minds of the jurors, who were, during all of the time, within the immediate and continuous view of the trial court. Nor does the record indicate that the trial court resubmitted the cause to the jury for further deliberation and determination of the issues tried; on the contrary, the record imports that the court

merely required the jury to designate which of the two incompatible and contradictory forms of verdict expressed the true finding and verdict of the jury. Under the judicial authorities above cited, the trial court, itself, had the inherent power and authority to amend and correct the verdict so as to make it conform to the real intention and actual finding of the jury, especially when guided (as here) by the jury pointing out to the court the form of verdict which manifested and expressed their true intention and finding, even though the jury had been formally discharged in the cause. But regardless of whether or not the action of the court in dismissing the jury (coupled, as it was, with a direction and requirement by the court that the jury must remain in the court-room) constituted a formal discharge of the jury, within the meaning of the law, nevertheless the record of the trial court clearly discloses that the court, immediately upon the discovery of the mutual mistake of the court and the jury, by its very action in refusing to receive and record either of the incompatible and contradictory forms of verdict, and in directing the jury to retire to their room and return a verdict, in effect set aside and rendered naught the discharge of the jury, which action of the court was had before the jurors had dispersed and separated, and before they had passed from without the view and supervision of the court. We are therefore constrained to the view and conclusion that no reversible error was committed by the trial court, under the circumstances imported by the record before us, in recalling and reassembling the jury, and in sending them to the jury room, in order that they might correct their manifest mistake by designating to the court which form of verdict was intended to express the true finding and verdict of the jury.

But the appellant urges that it is obvious from the record herein that the jury were "involved in error and confusion," and were "wrapped in perplexity and misconception," wherefore the defendant was deprived of an intelligent trial and determination of the issues by the jury, and, hence, that the trial court should have awarded defendant another and new trial of the issues. It is argued that the action of the trial court may have been viewed and construed by the jury as a suggestion or intimation of the court that the jury should return a verdict for plaintiff, rather than for the defendant. As we have said herein, we find in the record before us not the slightest intimation or suggestion by the trial court respecting which form of verdict the jury should return as expressing their true finding and verdict. The jury were merely advised, in substance and effect, that the court could not receive *both* forms of verdict, for the reason that they were contradictory and incompatible, and that the jury should reduce their finding to writing so as to clearly and certainly express

their true intention and verdict. There was no suggestion by the trial court, upon recalling the jury, that the jury should alter the *substance* of their verdict, but the record imports that the court merely informed the jury that they had not, as yet, returned *any* verdict, wherefore they should retire to their room and return "a verdict," thereby leaving the jury untrammeled and uninfluenced by any suggestion of the court as to what their verdict should be. We are not persuaded that the record discloses that the jurors were so ignorant and utterly lacking in average human intelligence as to be wholly incapable and incompetent of understanding and determining the issues in the cause, or the written instructions of the court. Rather are we persuaded from the record before us that the jurors, being unacquainted with the forms of law, were merely mistaken as to the manner or form in which the law required them to reduce their true verdict and finding to writing, which mistake they promptly corrected by returning a signed verdict, in no uncertain or ambiguous form, expressing their true intention and finding of the issues in favor of the plaintiff and against the defendant.

Lastly, it is urged by appellant that the trial court erred in receiving the verdict, and in entering a judgment thereon, because the  verdict, as received by the court and as recorded, did not dispose of all the parties to the cause, and therefore was fatally defective because not responding to all of the issues submitted by the written instructions of the court. On the commencement of the trial, there were three defendants to the cause, the corporate appellant, Railroad Company, and the two individuals, Briscoe and Murphy. The record discloses, however, that, at the close of the whole case, the court gave and read to the jury two written instructions, in the nature of demurrers to the evidence, which peremptorily told the jury that, under the pleadings and the evidence, the plaintiff was not entitled to recover against the individual defendants, Briscoe and Murphy. Thereupon, and before the submission of the cause to the jury, counsel for plaintiff announced in open court that, because of the direction of a verdict in favor of the individual defendants, Briscoe and Murphy, the plaintiff "desires to take involuntary nonsuits against the defendants, Murphy and Briscoe, with leave to move to set the same aside;" to which the court affirmatively responded, "All right; yes." Under the code procedure, applicable in our jurisdiction and in most other state jurisdictions, the taking by a plaintiff of an involuntary nonsuit as to one or more of several codefendants is equivalent to a dismissal of plaintiff's action as to the defendants against whom the involuntary nonsuit is taken (18 C. J. 1145, 1147) ; and, as a general rule, in tort actions, plaintiff may dismiss or discontinue as to a part of the defendants without discharging the rest, except where the action is for a tortious conspiracy entered into by all of the defend-

ants. [18 C. J. 1162.] An involuntary nonsuit having been taken by plaintiff herein, with the approval of the trial court, as to the individual defendants, Briscoe and Murphy, prior to the submission of the cause to the jury, it is clearly evident that there was no issue to be determined by the jury as respects the individual defendants, and that the only defendant remaining in the cause at the time of the submission of the cause to the jury was the corporate defendant, Railroad Company. Hence, the verdict of the jury disposed of all of the issues as between the only parties remaining in the cause at the time of submission, namely, the plaintiff, Keyes, and the corporate defendant, Chicago, Burlington & Quincy Railroad Company. Manifestly, the judgment properly disposed of all of the parties to the action, for it provides and adjudges that "plaintiff's cause of action be and the same is hereby dismissed as to defendants, T. A. Briscoe and J. P. Murphy, (and) that said defendants be discharged and go hence without day, . . . and that plaintiff have and recover of the defendant, Chicago, Burlington & Quincy Railroad Company, the sum of ten thousand ($10,000) dollars, together with the costs of this suit, and have therefor execution."

For the reasons above stated, we conclude that no error was committed by the trial court in the reception of the verdict, or in entering judgment for plaintiff thereon, and that the several assignments of error touching such action of the trial court must be denied.

II. Error is assigned in the action of the trial court in permitting Dr. Henry, a medical witness on behalf of plaintiff, to testify, over defendant's objection, respecting an injury to plaintiff's shoulders, when no such injury was pleaded in the petition as a basis for recovery of damages. Dr. Henry was permitted, over the aforesaid objection of defendant, to testify respecting the result of his examination of plaintiff, made on the day before the trial, as follows: "I found a very limited—quite limited—function of his (plaintiff's) shoulder joints; on attempting to raise his left arm, I found he could not raise his arm any higher than this (indicating), without giving away to complaint of pain, and there was a wrench on bringing his arm over in this manner ·(indicating); he could not bring his hand to the top of his head, neither his right nor left hand. Now that condition could be produced by a shortening of the ligaments of the shoulder joints, or it may be due as the result of injury to the nerves which supply the muscles of his arms and shoulders—for instance, the nerves which come down from the back of the cervical region, that go to make up all of the nerves which supply the muscles of the arm, forearm and shoulder muscles—the injury to the nerves which supply these muscles; and the functions of the muscles would be

limited, either from direct injury to the nerves, or inflammation of the nerves, which may follow the traumatism."

Among the various injuries specifically described and alleged in the petition to have been suffered by plaintiff were the following: "The vertebrae of plaintiff's spine in the upper portion thereof and the neck were fractured and dislocated, and the ligaments, tendons and tissues connected therewith (were) severely wrenched, torn and strained." We think that the injuries which Dr. Henry testified he found upon his examination of plaintiff fall within the specific injuries described and alleged in the petition. Moreover, the record shows that testimony of the same tenor was admitted upon the trial without any objection from defendant. Plaintiff had previously testified, without objection by defendant: "I feel pain in the back of my head, my back and shoulders; right down between my shoulders; that affects the motion of my arms, makes me stiff; I cannot move my arms; they hurt when I move them." Dr. Bennett, a medical witness proffered by defendant, when asked by defendant's counsel to relate what he found upon examination of plaintiff, testified: "I found some—he (plaintiff) complained of pains in the neck and shoulders, and I examined the neck and back and shoulders very closely, and found possibly some little thickening or stiffness like; he did not move exactly freely." It has been repeatedly and uniformly ruled by this court that a party to an action will not be heard to complain of the admission of testimony over his objection, where testimony of the same tenor has been admitted without his objection. [Laughlin v. Railway Co., 275 Mo. 459, 474; Gaty v. United Railways Co. (Mo. Sup.), 251 S. W. 61, 64; Gilchrist v. Kansas City Railways Co. (Mo. Sup.), 254 S. W. 161, 164.] The assignment of error must be denied.

III. Plaintiff chose to submit his case upon two instructions, both of which were given by the trial court and read to the jury. One of said instructions was on the measure of damages, the propriety of which will be considered and ruled in a subsequent paragraph of this opinion. The other of said instructions, numbered one, is as follows:

"The court instructs the jury that if you believe and find from the evidence that the plaintiff was a passenger upon a train of the defendant at the time he claims to have been injured, then having received plaintiff upon board of such train, the due obligation of the defendant to plaintiff was to use the highest degree of care practicable among prudent, skillful and experienced men in that same kind of business, to carry him safely, and a failure of the defendant (if you believe there was a failure) to

use such highest degree of care would constitute negligence on its part; and defendant would be responsible for all injuries directly resulting to plaintiff, if any, from such negligence, if any. And if you believe and find from the evidence that there was a collision between two trains of defendant on one of which plaintiff was a passenger (if you believe he was a passenger thereon), the presumption is that it was occasioned by some negligence of the defendant, and the burden of proof is cast upon the defendant to rebut this presumption of negligence and establish the fact that there was no negligence on its part, and that the injury, if any, was occasioned by inevitable accident, or by some cause which such highest degree of care could not have avoided.''

Appellant claims that such instruction is erroneous for the reason that it merely declares an abstract principle of law, and fails to apply the abstract principle of law, so declared therein, to the facts in evidence, or to require the jury to find any fact thereunder in arriving at a verdict; that the instruction is deficient in that it does not expressly require the jury to find a causal connection between the collision and plaintiff's injury, and erroneously imposes or shifts the burden of proof upon the defendant without first requiring the jury to find that plaintiff was injured in the collision; and that the instruction wholly ignores the one and only issue contested by the defendant carrier on the trial, viz., whether plaintiff received any injury as the direct and proximate result of the collision, and, in effect, assumes as an uncontroverted fact that plaintiff was so injured in the collision.

The criticised instruction is practically identical, in form and language, with an instruction of like tenor discussed and approved by this court in each of the several cases, infra, wherein the relation of passenger and carrier was established by the evidence, and the carrier's actionable liability was predicated solely upon the application of the doctrine *res ipsa loquitur*, under a charge or allegation of general negligence upon the part of the defendant carrier. [Price v. Street Railway Co., 220 Mo. 435, 444, 457 et seq.; Powell v. Railroad Co., 255 Mo. 420, 453, 458; Trowbridge v. Fleming (Mo. Sup.), 269 S. W. 610, 614, 615; Fowlkes v. Fleming, 322 Mo. 718, 725, 729, 17 S. W. (2d) 511, 512, 514.] In truth, it seems to be conceded, in the brief and argument of appellant, that the criticised instruction in the main rightly declares the applicable rule of law in a passenger and carrier case, wherein the defendant carrier's actionable liability is predicated upon a charge or allegation of general negligence on the part of the defendant carrier. But appellant argues, in seeking to distinguish the instant case from the cited cases, supra, that there was no dispute in the cited cases that plaintiff's injury was directly and proximately occasioned by some unusual circumstance occurring while plaintiff was a passenger for hire upon de-

fendant's car or train. It is therefore contended by the appellant that, inasmuch as it was strenuously contended by the defendant carrier on the trial of the instant cause that plaintiff suffered no injuries as the direct and proximate result of the collision in evidence, the giving to the jury of the criticised instruction should be held to constitute reversible error herein because the instruction fails to require a finding by the jury that the injuries of which plaintiff complains, and for which he seeks recovery of damages, were the direct and proximate result of the collision in evidence. In other words, the gravamen of appellant's contention appears to be that, in the cited cases, supra, wherein a similar or identical instruction was approved by this court, there was no dispute under the evidence as to the fact that plaintiff was injured in the collision, and therefore the omission to require a finding of the fact of injury in the instruction so approved in the cited cases was harmless, and hence was not reversible error; but that such omission in the criticised instruction is fatal in the instant case, because the issue or question whether plaintiff suffered any injuries as a direct and proximate result of the collision was in dispute and strenuously controverted by defendant throughout the trial of the instant case. Upon the foregoing premise as a basis, appellant seeks to distinguish the present case from the cited cases, supra, in respect to the correctness of the criticised instruction.

Viewing the instruction as a whole, we are of the opinion that it is not a mere abstract declaration of law, for at least the instruction does require a finding by the jury of the essential facts that plaintiff was a passenger upon defendant carrier's train at the time he claims to have been injured, and that there was a collision between two of defendant's trains, on one of which plaintiff was a passenger at the time. Neither do we view the instruction as tending to mislead or confuse the jury, nor as assuming the fact that plaintiff was injured as the direct and proximate result of the collision. In precise and unambiguous terms, the instruction declares the applicable law to be that "defendant would be responsible (that is to say, actionably liable) for all injuries *directly resulting* to plaintiff, if any, from such negligence, if any." The instruction does not undertake to direct a verdict, and is not peremptory in form or language. It seems to be conceded by appellant that the instruction, so far as it goes, properly declares the applicable law in a passenger and carrier case, wherein the carrier's actionable liability is predicated upon a charge of general negligence, under the doctrine of *res ipsa loquitur*, except that appellant insists that the instruction should have gone farther and expressly required a finding by the jury of the fact that plaintiff was injured in the collision, which fact, appellant insists, is an essential and necessary element

of plaintiff's recovery, and of defendant's actionable liability; in a passenger and carrier case. At most,. we are of opinion that the deficiency or omission, if any there be in the instruction, amounts to mere non-direction, and not misdirection, and does not constitute reversible error, under the settled rulings of our court. [Powell v. Railroad Co., 255 Mo. 420, 460; Morgan v. Mulhall, 214 Mo. 451, 462.] It may be conceded, of course, that plaintiff would not be entitled to a recovery herein, and the defendant carrier would not be actionably liable, if the record were wholly devoid of any substantial evidence that plaintiff suffered any injury in the collision, and if the record disclosed the entire want and absence of any substantial evidence tending to show a causal connection between the collision and plaintiff's injury. The want or absence of such evidence, however, was searched by defendant's peremptory instruction D, in the nature of a demurrer to the evidence, requested at the close of all the evidence, and refused by the trial court. Appellant does not press its demurrer to the evidence here, or assign error in the refusal thereof by the trial court. Consequently, it stands as tacitly admitted by appellant, or, at least, as unquestioned here, that the defendant's demurrer to the evidence was properly overruled by the trial court. That plaintiff received *some* injuries in the collision is substantially shown not only by the evidence adduced by plaintiff, but also by the evidence adduced by defendant. Dr. Chilton, a physician and surgeon employed by defendant, was proffered as a witness by defendant, and testified that he attended plaintiff at the Levering Hospital in Hannibal on August 17, 1925, the day on which the collision occurred, and found, from an examination of plaintiff, that plaintiff was suffering from "a slight concussion of the brain; that is, a shock or jar from an accident;" and Dr. Chilton testified further that he treated plaintiff for lacerated wounds which he found upon plaintiff's nose and forehead, and that plaintiff complained of his shoulders being bruised. Dr. Hornback, another physician proffered as a witness by defendant, testified that he attended plaintiff at Levering Hospital in Hannibal, and made an examination of plaintiff's eyes, and gave plaintiff treatment for hemorrhage, or "blood shot condition" of the eyes, from which the defendant's medical witness found plaintiff to be suffering. Thus, while the *extent and nature* of plaintiff's injuries were a matter of dispute upon the trial, there was no actual or serious dispute respecting the fact that plaintiff received *some* injuries in the collision. The giving of an instruction which assumes, instead of requiring the jury specifically to find, the existence of an undisputed fact, or a fact the existence of which the evidence adduced by both parties on the trial unquestionably establishes, does not constitute reversible error. [14 R. C. L. 739, 740; Midway National Bank

& Trust Co. v. Davis, 288 Mo. 563, 581; Davidson v. Transit Co., 211 Mo. 320, 356 et seq.; Sotebier v. Transit Co., 203 Mo. 702, 714.] If, as is ruled in the cited cases, supra, the court may, in its instructions to the jury, assume the existence of a fact which is established by the undisputed testimony, even though the existence of such fact be essential to entitle the plaintiff to a recovery, then it would seem to logically follow that no reversible error is committed by the court in giving an instruction which neither assumes, nor expressly requires the jury to find, the existence of such undisputed fact, where (as here) the instruction properly declares the applicable law of the case. However, we believe that the instruction fairly and clearly informed and advised the jury that the defendant carrier was responsible, or actionably liable, only for such injuries as directly resulted to plaintiff from negligence, if any, on the part of the defendant carrier, and that the jury must have known that plaintiff was not entitled to a verdict or a recovery unless his injuries were the direct and proximate result of the collision in evidence. We find no reversible error in the giving of plaintiff's instruction No. 1, and the assignment of error must be denied.

IV. Appellant assigns error in the giving of plaintiff's Instruction No. 2, on the measure of damages, which reads: "If the jury find for the plaintiff under all the evidence in the case and all the other instructions given by the court, in estimating and determining the amount of his damages, they may take into consideration *in connection with all the facts and circumstances in evidence,* the character and extent of his injuries, if any, occasioned by the collision of the trains in question and directly caused thereby, plaintiff's physical pain and mental anguish, if any, resulting from said injuries, if any, and whether such injuries or any of them are permanent in their nature and may find for him such sum as in the judgment of the jury *under all the evidence in the case* will fairly and reasonably compensate him for the injuries, if any, so received." [Italics ours.]

The claim of error assigned by appellant is grounded upon the inclusion in the instruction of the two italicized clauses. It is urged by appellant that a similar instruction was condemned by this court in May v. Railroad Co., 284 Mo. 508, 530. The reason for our ruling in the May case was discussed by us in the recent case of Sallee v. Railway Co., 321 Mo. 798, 12 S. W. (2d) 476, 479, and the holding in the May case was held to be inapplicable in a case where there are no facts or circumstances in evidence which can be said to excite the sympathy, or to engender the bias and prejudice, of the jury. After a critical examination of the record before us, we find in the instant case no facts or circumstances in evidence which can be well

or properly said to have had the slightest tendency to unduly excite the sympathy, or to engender the bias and prejudice, of the jury. The giving of an instruction on the measure of damages similar or identical with the instruction criticised by appellant herein has been held by this court, in several recent cases, not to constitute reversible error. [Salmons v. Railroad Co., 271 Mo. 395, 406; Hurst v. Railroad Co., 280 Mo. 566, 570; Zini v. Terminal Railroad Assn. (Mo. Sup. en banc), 250 S. W. 47, 49; Sacre v. Railway Co. (Mo. Sup.), 260 S. W. 85, 87; Sallee v. Railway Co., 321 Mo. 798, 12 S. W. (2d) 476, 479.]

Furthermore, if the defendant believed that the instruction, because of its form and language, might be misleading to the jury, it was defendant's duty and right to request an instruction advising the jury in more explicit language respecting the measure of plaintiff's damage, or otherwise limiting the amount of his recovery, or specifically excluding from the consideration of the jury such facts and circumstances in evidence as defendant deemed inapplicable and irrelevant to a determination of the amount of recovery. [Sallee v. Railway Co., supra, and cases there cited.] Availing itself of such right and duty, the appellant herein requested, and the trial court gave to the jury, a cautionary instruction, which expressly and pointedly told the jury that they *must not*, in considering their verdict, and in the event that they should find for plaintiff, "allow plaintiff any damages for any injuries, disease, pain, anguish or impaired physical condition, which you find and believe from the evidence he had or suffered prior to August 17, 1925 (the date of the collision), nor any damages for any injuries claimed to have been sustained by the plaintiff in the collision mentioned in the evidence *which you find from the evidence the plaintiff did not sustain in said collision.*" [Italics ours.] Such instruction, given by the trial court at the request and on behalf of defendant, clearly advised the jury that compensation or damages could be awarded to plaintiff for such injuries only as he sustained as the direct and proximate result of the collision in evidence. Viewing the two instructions together, and as a single charge to the jury, we cannot say that the jury were not rightly or fully instructed as to the true measure of plaintiff's damages. [Crane v. Foundry Co., 322 Mo. 592, 621.] The assignment of error must be denied.

V. Lastly, appellant claims that the verdict and judgment are excessive in amount. It is urged that the evidence discloses that, if plaintiff sustained any injuries in the collision, they were very slight, and that, in the light of all the evidence, the award is clearly exorbitant.

Plaintiff was sixty-four years of age at the time of the collision. For a month or six weeks prior to August 17, 1925, he had been employed as a common laborer, or section-man, in the plant of the Atlas Cement Company at Ilasco, a few miles south of Hannibal, receiving a monthly wage of $90. The evidence tends to show that plaintiff had worked steadily and continuously at his job, which consisted mainly of handling shovels, spike mauls, railroad ties and steel rails. Previously to his employment in the cement plant, he had worked in a rock quarry at Hannibal as a driller's helper, blasting rock. According to the testimony of his fellow-laborers, plaintiff apparently was a strong, able-bodied man prior to August 17, 1925, one witness testifying that he had worked with plaintiff in the latter part of 1924 and the early part of 1925, and had seen plaintiff lift a drill that weighed 350 pounds, and had seen him break rock with a 16-pound sledge. Respecting his bodily health prior to the collision in evidence, plaintiff testified: "I had good health, working steadily every day at manual labor of any kind. At the cement plant I handled ties, putting them in and taking them out. I carried ties and drove spikes. I have been doing railroad work like that for several years. I suffered with rheumatism, but very little. I never had rheumatism to amount to anything. I was sore sometimes, but it was not rheumatism. Before I was hurt, I never had any pains. I never had rheumatism before I got hurt. Had none of these aches and pains. Have had them since. My eyes were good; I never wore glasses. Could read without glasses. Cannot do any reading. Cannot see to do any reading. . . . I never had no rheumatism, bad spells of rheumatism, in my life. I had aching bones, but don't know whether you would call it rheumatism or not. Have it in the joints. These aching pains come on and go off. Sometimes I would have a pain, but I don't know whether you would call it rheumatism, or what you would call it. It was pains in my joints, in my knees, but my back never hurt me. . . . I would have those pains sometimes all night, when I would come in tired from work. I first noticed those pains several years ago. Would notice them just once in a while. . . . I would feel those pains after a hard day's work. The next morning I would be all right. I suffered no pain between the neck and shoulders before I was hurt, or the elbow, or with the hand."

The testimony tends to show that the force or impact of the collision threw plaintiff from the seat on which he was riding, and against the wooden seat immediately in front of the seat on which he had been riding, and that he fell upon the floor of the passenger coach. He was removed from the train, according to the testimony, in a dazed or semi-conscious condition, and immediately taken in an automobile to Levering Hospital in Hannibal, where he remained

as a patient until August 26, 1925, a period of nine or ten days. He commenced the instant action in the Circuit Court of the City of St. Louis on August 26, 1925, the day on which he left the hospital in Hannibal. According to his testimony, he went from the hospital to his home in Oakwood, a suburb of Hannibal, where he remained most of the time in bed for about two months, since which time, according to his testimony, ''I have been home ever since, I have never been anywhere until two months; I was right in the house; I was in bed two-thirds of the time, or more; I have been out of bed nearly every day; right smart of the time I stayed in bed; I expect half of the time; after I went home nobody treated me; Dr. Chilton called one time; no other doctors attended me, and I have not had any other doctor since that time.'' Plaintiff testified further that he had earned nothing since the day of the collision.

A number of X-ray photographs were taken of plaintiff's anatomy, and introduced in evidence as exhibits on the trial, showing the upper cervical vertebrae, the skull, arms, elbow joints, and hands. Much of the contrariety of opinion among the medical witnesses at the trial arose out of their respective interpretations of the X-ray photographs in evidence. Indeed, the medical witnesses proffered by the plaintiff, himself, were not in accord and harmony as respecting their interpretations of the X-ray photographs. One of the medical witnesses proffered by plaintiff identified certain of the X-ray photographs as having been taken by the witness a few days prior to the trial, and he interpreted the X-ray photographs so taken by him as disclosing a fracture at the base of plaintiff's skull, and a fracture at the lower surface of the fifth cervical vertebra. Referring to the photograph of the skull, he testified: ''The plate (photograph) shows the skull from the line of fracture itself; starts off to the left of the foramen magnum, that is, the hole in the skull where the spinal cord passes down; the line runs from the head down to the spinal cord; the line of fracture can be seen for about two inches; it is united.'' Other medical witnesses testified that the X-ray photographs so taken and interpreted by the last mentioned witness were imperfect, hazy, smudgy, and ''very poor exhibits,'' and that it was impossible to read or interpret the same, or to say that such exhibits disclosed any fracture of the skull, or of the cervical vertebra.

Other X-ray photographs introduced as exhibits on the trial were interpreted by certain of the medical witnesses as showing evidences of an exostosis, or bone arthritis, in the region of the third, fourth, fifth and sixth cervical vertebrae, and of a bony protuberance on the fifth lumbar vertebra. ''Arthritis'' was defined by the various medical witnesses as ''an inflammation of the joints,'' and as being most generally produced by an infection, or as resulting from

rheumatism, but is sometimes produced by a traumatic injury, or a violent blow. Some of the medical witnesses were of the opinion that the arthritic condition, as shown in the X-ray photographs in evidence, had existed for several years and the process of development was extremely slow, while others testified that such condition might develop within three or four months. The X-ray photographs in evidence were all taken within two years after August 17, 1925, and some of the photographs were taken about four months after said date.

Dr. Hoge, a neurologist, testified that he made an examination of plaintiff in December, 1925, and that his findings from such examination indicated that plaintiff was suffering from some disease or derangement of the central nervous system; and, in answer to a hypothetical question, hypothesizing the facts relating to the collision in evidence, he said he believed that the facts as hypothesized might cause or produce such a condition of the central nervous system, and that, in his opinion, such condition would be permanent.

Dr. Shoemaker, an oculist, testified that he had examined plaintiff's eyes in December, 1925, and again on the Saturday immediately before the trial in November, 1926; that on the last examination (immediately before the trial) he found "the optic nerves somewhat atrophied, and a concentric contraction of the visual field, and the right eye, which was worse than the left, had a haziness in the chrystalline lens;" that plaintiff had thirteen per cent vision in the right eye in October or November, 1926, and had seventeen per cent vision in the right eye in December, 1925, when he first examined plaintiff's eyes. The left eye had seventy per cent vision in October, 1926. He testified further that an injury or blow at the base of the skull frequently causes an atrophy of the optic nerve, and that vision may be materially reduced in three or four months time by such an injury, but that a blow at the base of the brain would very likely affect both eyes instead of one.

The testimony of defendant's medical witnesses tended to minimize and belittle plaintiff's injuries, and to show that his injuries, if any there be, were slight and superficial in character and extent, except that defendant's witnesses were of opinion that plaintiff was suffering from an arthritis which antedated the collision several years. Defendant's medical witnesses testified that they found no fractures of plaintiff's skull, or other bones of his body, and found no displacement of the vertebrae, and that the several X-ray photographs in evidence indicated no fractures.

As we have stated above, there was a sharp conflict among the several medical witnesses respecting their interpretations of the X-ray photographs, and as to what the photographs show plaintiff's injuries to be, and as to whether the conditions shown by the

X-ray photographs were directly and proximately attributable to the collision in evidence. Speaking to such a situation, Division Two of this court has recently said, in Manley v. Wells, 292 S. W. 67, 69, wherein an excessive verdict was contended by the appellant: "All that can be said of the testimony of the interpreters of the shadowgraphs is, as was said of the testimony at a famous trial held nearly nineteen centuries ago: 'Their witnesses agreed not together.' In this state of the record we must decline to examine a number of X-ray pictures offered in evidence at the trial and filed in this court by appellant with the abstract of the record. The writer freely disqualifies as an interpreter of shadowgraphs. Besides, it is not the province of an appellate court to weigh conflicting testimony. The credibility of the witnesses is a queston for the jury. Their verdict, supported by substantial testimony, having received the approval of the trial court, conclusively settled all questions of fact in favor of the plaintiff, and will not be interfered with on appeal. [Westervelt v. St. Louis Transit Co., 222 Mo. 325, 333, 336; Holzemer v. Met. St. R. Co., 261 Mo. 379, 411.]"

There is no accurate or infallible guide to be followed by an appellate court in passing upon the matter of the excessiveness of an award for personal injuries. The best that an appellate court can do in such cases is to exercise a sound and impartial judgment in considering whether the award is fair and reasonable under all the circumstances of the particular case. As we recently said, in Laughlin v. Railway Co., 275 Mo. 459, 472: "The most reliable rule for the guidance of an appellate court in determining whether a verdict is excessive, is that, if sustained by substantial evidence, it will not be disturbed, unless the amount is such as to shock the judicial conscience, or there are [clear] indications that the jury was swayed by passion, prejudice, or in some way unduly influenced."

Considering all the circumstances of the instant case, as disclosed by the record before us, we cannot say that the verdict of the jury was the result of passion or prejudice on the part of the jury, or can we say that the amount of the verdict is so palpably excessive, or beyond the bounds of reason, as to shock the judicial conscience. The trial court, who viewed plaintiff and the witnesses on the trial, and was in better position to judge of the credibility of the witnesses and of their testimony than is an appellate court, approved the verdict of the jury, and did not see fit to order a *remittitur*, or to award defendant a new trial of the cause, although the excessiveness of the verdict was urged below in defendant's motion for a new trial.

Appellant, by its several assignments of error, has directed our attention to no reversible error herein, and hence the judgment *nisi* must be affirmed. It is so ordered. *Ellison, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.